# Exhibit "A"

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

PAINTEQ, LLC,

     Plaintiff,

vs.

     Case No. 20-CA-003136

     Division: E

CHAD SUBASIC, and
OMNIA MEDICAL, LLC,

     Defendants.

_____/

## **VERIFIED AMENDED COMPLAINT**

     PainTEQ, LLC, sues Chad Subasic and Omnia Medical, LLC and alleges as follows:

### Jurisdiction, Parties, and Venue

1.     The Court has subject matter jurisdiction under agreements between the Parties and, under section 26.012(2)(a) of the Florida Statutes, because this is an action for damages in excess of $30,000, exclusive of interest, costs, and attorneys' fees.

2.     PainTEQ, LLC is a Florida limited liability company with its principal place of business in Hillsborough County, Florida.

3.     Chad Subasic is a former PainTEQ employee who resides in Hillsborough County, Florida.

4.     Omnia Medical, LLC is an Ohio limited liability company with its principal place of business in Morgantown, West Virginia.

5.     The Court has personal jurisdiction under section 48.193 of the Florida Statutes over Mr. Subasic because he is a Florida resident, committed tortious acts within Florida, breached

contracts in Florida, and consented to the Court's jurisdiction under his contracts with PainTEQ.

6.     The Court has personal jurisdiction under section 48.193 of the Florida Statutes over Omnia Medical because it operates, conducts, transacts, engages in, or carries on a business or business venture in Florida, is registered to do business in Florida, appointed a registered agent in Florida, engaged and is engaging in tortious acts in Florida, and caused and is causing injury to PainTEQ in Florida.

**7.**     Venue is proper in Hillsborough County because the causes of action accrued, Mr. Subasic consented under agreements with PainTEQ to venue, and Mr. Subasic resides, in Hillsborough County, Florida.

## General Allegations

8.     This action seeks damages and injunctive relief for breaches of contracts with PainTEQ, misappropriation of PainTEQ's trade secrets, tortious interference with PainTEQ's business interests, and defamatory statements made about PainTEQ.

### I.     PainTEQ's vision for interventional pain management.

9.     PainTEQ provides services and solutions to the interventional pain management community, including interventional spine specialist physicians.

10.     Due to its substantial investment, innovation, and leadership, PainTEQ enables interventional spine specialist physicians to provide their patients with pain-relieving solutions that traditionally only spinal surgeons could.

11.     Today, these solutions include PainTEQ's LinQ™ posterior joint fusion procedure.

12.     This innovative procedure allows for fusion and stabilization of the sacroiliac (SI) joint in patients where appropriate non-surgical treatment has failed.

2

13.     Traditionally, the manufacturers, distributors, and sellers of SI joint fusion implants and instrumentation avoided the interventional pain management community and instead focused primarily on spinal surgeons.

14.     PainTEQ envisioned that with the proper training, education, and support, interventional spine specialists could perform SI joint fusions and deliver optimal patient outcomes.

15.     To bring its vision to fruition, PainTEQ initially served as the exclusive distributor for Omnia Medical implants and instrumentation for SI joint fusion procedures in the interventional pain community.

16.     Omnia Medical was skeptical of PainTEQ's vision, but since it focused its marketing efforts on orthopedic surgeons and not interventional pain management physicians, Omnia Medical was willing to reap the benefits of any success that PainTEQ might achieve.

### II.     Omnia Medical's inability to meet demand created by PainTEQ gives rise to the LinQ™ procedure.

17.     PainTEQ achieved far more success than Omnia Medical apparently expected.

18.     SI joint fusion procedures proved extremely popular in the interventional pain community.

19.     Omnia Medical struggled to supply enough implants to meet the demand generated by PainTEQ's success.

20.     Omnia Medical's struggles forced PainTEQ, on several occasions, to ask physicians to postpone procedures.

21.     PainTEQ provided Omnia Medical multiple opportunities to correct its supply deficiencies, but ultimately it failed to do so.

3

22.     Faced with ever-increasing demand for SI joint fusion procedures and an unreliable supplier, PainTEQ was forced to part ways with Omnia Medical.

23.     In the process of selecting a new supplier, PainTEQ took the opportunity to improve its entire SI joint fusion approach and procedure.

24.     The current generation resulting from those improvements is the LinQ™ procedure.

25.     Unlike the SI joint fusion procedure performed using the Omnia Medical implants and instrumentation, the LinQ™ procedure uses one implant instead of two, does not drill into the patient's bone, and does not require mounting of the instrumentation to the operating table during the procedure.

26.     Physicians recommend the LinQ™ procedure and prefer it to those offered by PainTEQ's competitors because it is minimally invasive, implants no metal, features a short procedure time, promotes a fast recovery, and enjoys effective results.

27.     To provide the LinQ™ procedure, PainTEQ partners with two suppliers: one for the implant and one for the instrumentation.

28.     To help ensure the best outcome for each and every procedure, including the LinQ™ procedure, PainTEQ trains and supports physicians in the PainTEQ program.

29.     This includes bio-skills training and certification for PainTEQ procedures, including the LinQ™ procedure, marketing literature and demonstrative aids to support patient education, patient leads, and coding, billing, authorization, and reimbursement support.

### III.     PainTEQ's sales team

30.     To support physicians in the PainTEQ program and their staff, and to help sell solutions like the LinQ™ procedure to the interventional pain community, PainTEQ employs a sales team.

31.     PainTEQ also partners with distributors with existing relationships to sell PainTEQ solutions.

32.     Mr. Subasic was employed by PainTEQ as a member of PainTEQ's sales team.

33.     PainTEQ employs a team of clinical support personnel to help train and support physicians in the PainTEQ program, as well as members of the PainTEQ sales team.

34.     These clinical support personnel attend and participate in physicians' initial surgeries in the PainTEQ program and provide ongoing support.

35.     When new sales team members join PainTEQ, they receive significant onboarding training, education, and support, including training and education on PainTEQ's services and solutions and how to market them.

36.     PainTEQ trains and educates its sales team members to identify and recruit physicians for the PainTEQ program.

37.     PainTEQ also trains and educates its sales team members to identify and recruit customers for the PainTEQ program, which include ambulatory surgery centers, hospital outpatient surgery centers, and hospitals.

38.     To promote the success of its new sales team members, PainTEQ provides them with a portfolio of physicians in the PainTEQ program that are identified, recruited, and developed by PainTEQ.

39.     New PainTEQ sales team members also attend mock surgeries with PainTEQ clinical support personnel to obtain a complete understanding of PainTEQ's services, solutions, and procedures prior to engaging with physicians and patients.

40.     PainTEQ shares substantial information with its sales team members, including information about PainTEQ's solutions, services, procedures, systems, training, education,

marketing, and pricing, and lists of its current and prospective physicians and customers in the PainTEQ program.

41.     PainTEQ invests substantially in developing and maintaining this information.

42.     This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, competitors who can obtain economic value from its disclosure or use.

43.     PainTEQ views this information as its confidential, proprietary, and trade secret information.

44.     The healthcare industry, including the market for interventional pain management, is highly competitive.

45.     PainTEQ's success in introducing SI joint procedures to the interventional pain management community, including with the LinQ™ procedure, has made that competition even more pronounced.

46.     As a result, PainTEQ takes appropriate measures that are reasonable under the circumstances to protect its confidential, proprietary, and trade secret information and prevent its disclosure.

47.     These measures include restricting access to authorized users only and requiring password-protected access with dual authentication.

48.     These measures include nondisclosure provisions in agreements with PainTEQ business partners, including physicians and customers.

49.     These measures also include, as a condition of employment, that PainTEQ employees enter into agreements that protect PainTEQ's confidential, proprietary, and trade secret information.

50.     These agreements include those entered into by Mr. Subasic: the Confidentiality, Noncompetition and Nonsolicitation Agreement attached as Exhibit A and the Confidentiality Agreement attached as Exhibit B.

51.     As their titles suggest, the agreements between PainTEQ sales team members (including Mr. Subasic) and PainTEQ contained confidentiality, noncompetition, and nonsolicitation restrictive covenants.

52.     These restrictive covenants prevented, and continue to prevent, these sales team members (including Mr. Subasic) from competing with PainTEQ, from interfering with any of PainTEQ's business relationships, from improperly using, retaining, or disclosing PainTEQ's confidential and proprietary information, and from soliciting its employees.

### IV.     Omnia Medical seized on the adversity caused by the COVID-19 pandemic to seek revenge against PainTEQ.

53.     Despite the training, education, and support provided by PainTEQ, Mr. Subasic and other sales team members consistently failed to meet their sales goals.

54.     As a result, two former sales team members left PainTEQ in October 2019, and another's employment was terminated in January 2020.

55.     Due to multiple job performance issues in addition to failing to meet sales goals, on March 2, 2020, PainTEQ issued Mr. Subasic with a performance improvement plan, or PIP.

56.     The PIP required Mr. Subasic to meet several improved job performance expectations within the following 90 days.

57.     The PIP indicated that termination of employment could occur if Mr. Subasic did not make significant job performance improvements or if he shared or complained about the PIP.

58.     In the weeks following the issuance of the PIP to Mr. Subasic, like the entire medical industry, PainTEQ was significantly and negatively impacted by the Coronavirus Disease 2019 (COVID-19) outbreak.

59.     PainTEQ continued and continues to support elective procedures where permitted throughout the COVID-19 pandemic, but many jurisdictions, including Florida, prohibited such procedures.

60.     As a result, PainTEQ was forced to take several steps to preserve its business.

61.     PainTEQ continued to employ several members of its sales and clinical support teams and other personnel but was forced to furlough and terminate the employment of others, with the plan to re-hire several once it was able to do so.

62.     Given his prior job performance issues, compounded by the COVID-19 pandemic, on March 23, 2020 PainTEQ terminated Mr. Subasic's and other sales team members' employment.

63.     On April 16, 2020, PainTEQ re-hired eight employees.

64.     Amidst the struggle of PainTEQ and countless other businesses to survive the COVID-19 pandemic — including by retaining valuable employees, preserving valuable business relationships, and attempting to continue to serve patients — Omnia Medical launched its revenge campaign.

65.     Omnia Medical was upset when PainTEQ parted ways with it over its struggle to supply enough implants to meet the demand generated by PainTEQ's success.

66.     Omnia Medical was shocked by PainTEQ's success and realized its skepticism of PainTEQ's vision for bringing SI joint fusion to the interventional pain community was a grave mistake.

67.     But rather than compete legitimately through the same or better investment, innovation, and leadership shown by PainTEQ, Omnia Medical took an illicit approach to capitalize on PainTEQ's success.

68.     Omnia Medical had already hired one former PainTEQ sales team member directly (now Omnia Medical's Regional Vice President of Sales) and another as a distributor, in violation of their noncompetition agreements with PainTEQ.

69.     Omnia Medical, aided by these two former PainTEQ sales team members, then recruited the other terminated PainTEQ sales team members to join Omnia Medical.

70.     Upset at their termination by PainTEQ, some of the terminated PainTEQ sales team members, including Mr. Subasic, were eager to join Omnia Medical's revenge campaign.

71.     To aid in this revenge campaign, the terminated PainTEQ sales team members, including Mr. Subasic, shared PainTEQ's confidential, proprietary, and trade secret information with Omnia Medical.

72.     Omnia Medical and the terminated PainTEQ sales team members, including Mr. Subasic, used this information to target the physicians and customers in PainTEQ's program and those that PainTEQ has been actively recruiting.

73.     Physicians and customers in PainTEQ's program have been contacted and provided with false and defamatory information about PainTEQ and encouraged to work with Omnia Medical instead of PainTEQ. A copy of an announcement for a webinar evidencing Omnia Medical's efforts to target a physician in PainTEQ's program and a physician PainTEQ had recruited for its program is attached as Exhibit C.

74.     One physician in PainTEQ's program was contacted and provided with false and defamatory information, including that PainTEQ had recently announced that it needed to

shut down its operations, and encouraged to use Omnia Medical's SI joint fusion system instead of PainTEQ's.

75.     Mr. Subasic contacted a physician in PainTEQ's program and provided false and defamatory information about PainTEQ, including that PainTEQ had changed its name and that physician should still contact Mr. Subasic for upcoming procedures.

76.     Mr. Subasic contacted physicians in PainTEQ's program and, by improperly using PainTEQ's confidential and proprietary pricing information, encouraged the physicians to switch to Omnia Medical's SI joint fusion system, including by undercutting PainTEQ's pricing. A copy of a text message evidencing Mr. Subasic's efforts is attached as Exhibit D.

77.     At least one physician in PainTEQ's program has done so.

78.     Mr. Subasic, by improperly using PainTEQ's confidential and proprietary pricing information, persuaded a physician in PainTEQ's program to contact one of PainTEQ's largest customers and encourage it to switch to Omnia Medical's SI joint fusion system by undercutting PainTEQ's pricing. A copy of a text message evidencing Mr. Subasic's efforts is attached as Exhibit E.

79.     Another terminated PainTEQ sales team member contacted a physician in PainTEQ's program and encouraged the physician to end the physician's business relationship with PainTEQ and work with Omnia Medical instead.

80.     Another terminated PainTEQ sales team member contacted a physician in PainTEQ's program and provided false and defamatory information about PainTEQ, including that PainTEQ was out of business, and encouraged the physician to work with Omnia Medical instead. A copy of the text message evidencing this effort is attached as Exhibit F.

81.     PainTEQ's distributors have been contacted by Omnia Medical and provided with false and defamatory information about PainTEQ and pressured to distribute for Omnia Medical instead of PainTEQ.

82.     One terminated PainTEQ sales team member contacted a PainTEQ distributor and provided false and defamatory information about PainTEQ, including that Omnia Medical had sued PainTEQ and that PainTEQ was out of business, and encouraged the distributor to distribute for Omnia Medical instead of PainTEQ.

83.     The terminated PainTEQ sales team members, including Mr. Subasic, have encouraged current PainTEQ employees to terminate their employment with PainTEQ and work for Omnia Medical. A copy of a text message evidencing these efforts is attached as Exhibit G.

84.     The terminated PainTEQ sales team members, including Mr. Subasic, have encouraged current PainTEQ employees to terminate their employment with PainTEQ and use PainTEQ's confidential, proprietary, and trade secret information to sell for Omnia Medical.

85.     One terminated PainTEQ sales team member has provided false and defamatory information about PainTEQ, including that PainTEQ was out of business.

86.     Mr. Subasic encouraged a current PainTEQ employee to terminate employment with PainTEQ, told the employee that if the employee terminated employment with PainTEQ, he "had a plan" and could help the employee, or the employee could get work through one of Mr. Subasic's relatives.

87.     In other words, despite the restrictive covenants' prohibition against doing so, the terminated PainTEQ employees, including Mr. Subasic, have improperly used and disclosed PainTEQ's confidential and proprietary information, including to Omnia Medical.

11

88.    Despite the restrictive covenants' prohibition against doing so, the terminated PainTEQ employees, including Mr. Subasic, have improperly solicited at least one current PainTEQ employee.

89.    Despite the restrictive covenants' prohibition against doing so, the terminated PainTEQ employees, including Mr. Subasic, have improperly interfered with PainTEQ's business relationships, including by attempting to persuade physicians to cease doing business with PainTEQ in favor of Omnia Medical.

90.    Despite the requirements under their agreements with PainTEQ that they return all confidential, proprietary, and trade secret information upon PainTEQ's request, the terminated PainTEQ employees, including Mr. Subasic, have failed to do so.

91.    Seizing on the adversity created by the COVID-19 pandemic, Omnia Medical, aided by the terminated PainTEQ sales team members, including Mr. Subasic, improperly and illicitly sought, and continue to seek, revenge against Pain TEQ.

92.    The terminated PainTEQ employees, including Mr. Subasic, have also defamed PainTEQ.

93.    On top of the statements made to physicians, Mr. Subasic told the current PainTEQ employee that:

    a.    PainTEQ's leadership "has no idea what they're doing";

    b.    PainTEQ's leadership "has no idea how to run a business";

    c.    PainTEQ's leadership "has no idea how to run a company";

    d.    PainTEQ has "spent all its money";

    e.    PainTEQ "doesn't have money left to pay anyone";

    f.    "There's no way PainTEQ will make it through this";

    g.    "PainTEQ is done after this";

h.      "Once doctors find out what PainTEQ has done, there's no way PainTEQ can survive"; and

i.      "PainTEQ has shut down its operations."

94.    Mr. Subasic has encouraged others, including other terminated PainTEQ sales team members, to repeat his defamatory statements, and they did so, including on the internet and in multiple LinkedIn posts.

95.    Two of the terminated PainTEQ sales team members have told individuals in the interventional pain community that PainTEQ is "out of business."

96.    As a result of the breaches of PainTEQ's agreements, misappropriation of PainTEQ's trade secrets, tortious interference with PainTEQ's business relationships, and the false, materially misleading, and defamatory statements, PainTEQ's business has suffered and continues to suffer.

97.    PainTEQ engaged the undersigned law firm to represent it in this action and is obligated to pay a reasonable fee for its services.

98.    All conditions precedent to maintaining this action have occurred, been performed, or have been waived.

**Count One**
**Breach of Contract against Chad Subasic**

99.    PainTEQ realleges and incorporates by reference paragraphs 1 through 98.

100.   This is a claim against Chad Subasic for breach of contract.

101.   The Confidentiality, Noncompetition and Nonsolicitation Agreement attached as Exhibit A and the Confidentiality Agreement attached as Exhibit B are valid and binding contracts.

102.   PainTEQ performed its contractual obligations under both agreements.

13

103.    Section 1(a) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that "after termination of" Mr. Subasic's employment with PainTEQ, he "shall not retain or remove any Proprietary Information (as defined below)."

104.    Section 1(b) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that Mr. Subasic "shall not use or disclose to any person any material information (written or unwritten) concerning trade secrets, proprietary data, or other valuable confidential or business information relating to the business or financial affairs of the Company (collectively, 'Proprietary Information')."

105.    Section 1 of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that during Mr. Subasic's employment with PainTEQ and for two years after termination of Mr. Subasic's employment "for any or no reason," if:

> the Company requests the return of any Proprietary Information, Restricted Party promptly (and in any event within five (5) days) shall return to the Company all Proprietary Information. Restricted Party shall not place any Proprietary Information on any personal storage devices.

106.    Section 2 of the Confidentiality Agreement states that Mr. Subasic:

> shall not disclose any Confidential Information of Company to any third party, and shall only use Confidential Information of Company in connection with its internal evaluations of a proposed transaction or business relationship between the Parties.

107.    Section 1(d) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that Mr. Subasic:

> shall not persuade or attempt to persuade any physician or other health care provider, agent, supplier, manufacturer, customer, contractor, prospective

physician or customer or other person who has a business relationship with the Company to cease to do business with the Company, reduce the amount of business that it historically has done with the Company, or otherwise adversely alter its business relationship with the Company.

108.    Section 1(e) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that during Mr. Subasic's employment with PainTEQ and for two years after termination of Mr. Subasic's employment "for any or no reason," Mr. Subasic:

shall not shall not engage in any business, acquire an interest in any business, or serve as an agent, lender, manager, owner, officer, director, employee, investor, consultant, representative, or independent contractor of any business that directly or indirectly competes with the Company anywhere in the United States of America.

109.    Section 1(f) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that during Mr. Subasic's employment with PainTEQ and for two years after termination of Mr. Subasic's employment "for any or no reason," Mr. Subasic:

shall not hire, offer, recruit, solicit, influence, or attempt to influence, any person who either is an employee or independent contractor of the Company or has been an employee or independent contractor of the Company during the last six (6) months Restricted Party was associated with the Company to terminate his employment or association with the Company for the purpose of working for Restricted Party or any other person.

110.    The restrictive covenants contained in the Confidentiality, Noncompetition and Nonsolicitation Agreement and the Confidentiality Agreement are reasonable and no greater than necessary under the circumstances to protect PainTEQ's legitimate business interests,

including the Confidential Information and Proprietary Information, that Mr. Subasic received during his time with PainTEQ.

111.    The restrictive covenants contained in the Confidentiality, Noncompetition and Nonsolicitation Agreement are reasonable and no greater than necessary under the circumstances to protect PainTEQ's legitimate business interests, including substantial relationships with prospective and existing customers, referral sources, and associated goodwill.

112.    Mr. Subasic has violated, among other provisions, Section 1 of the Confidentiality, Noncompetition and Nonsolicitation Agreement and Section 2 of the Confidentiality Agreement.

113.    With these violations, Mr. Subasic materially breached the Confidentiality, Noncompetition and Nonsolicitation Agreement and the Confidentiality Agreement.

114.    Mr. Subasic's actions and material breaches directly and proximately caused, and continue to cause, PainTEQ damages.

115.    Mr. Subasic's actions and breaches have caused, and under Section 3 of the Confidentiality, Noncompetition and Nonsolicitation Agreement, Section 5 of the Confidentiality Agreement, and section 542.335(1)(j) of the Florida Statutes are presumed to have caused, and unless enjoined by the Court, will continue to cause, PainTEQ irreparable injury, since it is impossible to determine the value of any resulting loss of substantial relationships with prospective and existing customers, referral sources, associated goodwill, or disclosure of Confidential or Proprietary Information.

116.    The damages sustained by PainTEQ as a direct and proximate result of Mr. Subasic's actions and breaches, including the violations of the restrictive covenants,

are of a kind and degree that cannot be completely compensated by monetary damages, leaving PainTEQ with no adequate remedy at law.

117.    The balance of the equities tips decidedly in favor of PainTEQ because the restrictive covenants are limited and serve to protect legitimate business interests, including protecting PainTEQ's substantial relationships with prospective and existing customers, referral sources, associated goodwill, and Confidential or Proprietary Information.

118.    Mr. Subasic remains free to work so long as he does not engage in conduct that violates the terms of the restrictive covenants.

119.    The public interest is best served in this instance by enforcement of the restrictive covenants to prevent further breaches of the restrictive covenants and egregious tortious conduct and unfair competition.

120.    Under Section 3 of the Confidentiality, Noncompetition and Nonsolicitation Agreement, Section 5 of the Confidentiality Agreement, and section 542.335(1)(j) of the Florida Statutes, PainTEQ is entitled to a preliminary injunction and a permanent injunction as fully specified below, enjoining Mr. Subasic from, among other things, breaching the restrictive covenants by soliciting PainTEQ's customers or interfering with PainTEQ's substantial relationships with prospective or existing customers, interfering with PainTEQ's substantial relationships with referral sources, competing with PainTEQ, and wrongfully exploiting and disclosing PainTEQ's Confidential and Proprietary Information.

121.    To the extent they may be calculated, PainTEQ is also entitled to monetary damages, in an amount to be determined at trial, for Mr. Subasic's actions and breaches, including actual damages, consequential damages, and other damages.

122.     As a direct and proximate result of Mr. Subasic's actions, under Section 4(c) of the Confidentiality, Noncompetition and Nonsolicitation Agreement, Section 9 of the Confidentiality Agreement, and section 542.335(1)(k) of the Florida Statutes, PainTEQ is entitled to recover its attorneys' fees and costs.

WHEREFORE, PainTEQ demands the Court to:

A.      Enjoin Mr. Subasic from, directly or indirectly, engaging in any manner or capacity in any business activity that competes with PainTEQ, except as expressly allowed in the Confidentiality, Noncompetition and Nonsolicitation Agreement;

B.      Enjoin Mr. Subasic from inducing, or attempting to induce, any customer of PainTEQ to cease doing business with PainTEQ or in any way interfering with the relationship between any such customer or prospective customer and PainTEQ;

C.      Enjoin Mr. Subasic from inducing, or attempting to induce, any referral source of PainTEQ to cease doing business with PainTEQ or in any way interfering with the relationship between any such referral source and PainTEQ;

D.      Order Mr. Subasic to return to PainTEQ any and all data, documents, information and other materials that contain, constitute, or comprise PainTEQ's Confidential or Proprietary Information, including PainTEQ's Microsoft Surface Pro, training materials, and marketing materials;

E.      Enjoin Mr. Subasic from using or disclosing any and all data, documents, information, and other materials that contain, constitute, or comprise PainTEQ's Confidential or Proprietary Information, including PainTEQ's Microsoft Surface Pro, training materials, and marketing materials;

F.      Extend the period of the noncompetition and nonsolicitation restrictive covenants for the duration of Mr. Subasic's non-compliance;

G.      Enter judgment in favor of PainTEQ;

H.      Award PainTEQ damages in an amount to be determined at trial that exceeds $30,000.00, which includes:

i.      compensatory damages; and

ii.      consequential damages, including lost profits;

I.      Award PainTEQ its reasonable attorneys' fees and costs under Section 4(c) of the Confidentiality, Noncompetition and Nonsolicitation Agreement, Section 9 of the Confidentiality Agreement, and section 542.335(1)(k) of the Florida Statutes;

J.      Award PainTEQ interest; and

K.      Award PainTEQ all further relief the Court finds just and proper.

**Count Two**
**Tortious Interference with a Business Relationship against Chad Subasic**

123.   PainTEQ realleges and incorporates by reference paragraphs 1 through 98.

124.   This is an action against Chad Subasic for tortious interference with a business relationship.

125.   At all relevant times, PainTEQ has maintained business relationships with its customers and referral sources.

126.   At all relevant times, Mr. Subasic has had knowledge of PainTEQ's business relationships with its customers and referral sources.

127.    Mr. Subasic has engaged in, is engaging in, or is threatening to engage in, intentional and unjustified interference with PainTEQ's business relationships with its customers and referral sources.

128.    Mr. Subasic's breach of these relationships has directly and proximately caused PainTEQ injury. There is no plain, speedy, or adequate remedy at law, and unless Mr. Subasic is enjoined from further tortious interference with PainTEQ's business relationships, PainTEQ will be irreparably injured.

129.    To the extent they can be calculated, PainTEQ has also suffered actual damages, plus consequential and other damages flowing from Mr. Subasic's tortious interference with PainTEQ's business relationships in an amount to be determined at trial, plus interest and costs.

WHEREFORE, PainTEQ demands the Court to:

A.    Enjoin Mr. Subasic from engaging in any and all tortious interference with PainTEQ's business relationships with its customers and referral sources;

B.    Enter judgment in favor of PainTEQ;

C.    Award PainTEQ damages in an amount to be determined at trial that exceeds $30,000.00, and which includes:

i.    compensatory damages; and

ii.    consequential damages, including lost profits;

D.    Award PainTEQ its reasonable attorneys' fees and costs under Section 4(c) of the Confidentiality, Noncompetition and Nonsolicitation Agreement, Section 9 of the Confidentiality Agreement, and section 542.335(1)(k) of the Florida Statutes;

20

E.      Award PainTEQ interest; and

F.      Award PainTEQ all further relief the Court finds just and proper.

**Count Three**
**Defamation against Chad Subasic**

130.    PainTEQ realleges and incorporates by reference paragraphs 1 through 98.

131.    This is a claim against Chad Subasic for defamation.

132.    Mr. Subasic published false statements about PainTEQ to a third party.

133.    Specifically, Mr. Subasic published statements about PainTEQ to a third party, asserting as fact that:

a.      PainTEQ's leadership "has no idea what they're doing";

b.      PainTEQ's leadership "has no idea how to run a business";

c.      PainTEQ's leadership "has no idea how to run a company";

d.      PainTEQ has "spent all its money";

e.      PainTEQ "doesn't have money left to pay anyone";

f.      "There's no way PainTEQ will make it through this";

g.      "PainTEQ is done after this";

h.      "Once doctors find out what PainTEQ has done, there's no way PainTEQ can survive"; and

i.      "PainTEQ has shut down its operations."

134.    Mr. Subasic's statements are defamatory because they:

a.      Injure PainTEQ in its profession and business;

b.      Impeach PainTEQ's honesty, integrity, virtue, and reputation; and

c.      Injure PainTEQ's reputation and thereby expose PainTEQ to public hatred, contempt, ridicule, or financial injury.

135.   Mr. Subasic's statements constitute common law defamation per se because they injure PainTEQ in its profession and business.

136.   Mr. Subasic's defamatory statements require no proof of their injurious character because they obviously harm PainTEQ.

137.   Mr. Subasic's statements also constitute common law defamation per quod because his statements directly and proximately caused and continue to cause injury to PainTEQ, resulting in damages.

138.   Mr. Subasic published statements negligently, knowingly, or with reckless disregard for their falsity.

139.   Mr. Subasic's statements directly and proximately caused and continue to cause injury to PainTEQ, resulting in damages.

140.   Mr. Subasic's statements caused and continue to cause PainTEQ irreparable injuries for which there is no adequate legal remedy.

WHEREFORE, PainTEQ demands the Court to:

A.   Enter a temporary injunction:

i.   Enjoining Mr. Subasic from publishing any false statements that defame or disparage PainTEQ;

ii.   Requiring Mr. Subasic to correct any false statements he made that defame or disparage PainTEQ and to remove any such false statements that have been anywhere on the internet, including websites, social media and messaging platforms, and blogs;

B.     Enter a permanent injunction, ordering Mr. Subasic as follows:

    i.     Prohibiting Mr. Subasic from publishing any false statements that defame or disparage PainTEQ, including anywhere on the internet, including websites, social media and messaging platforms, and blogs;

    ii.     Requiring Mr. Subasic to correct any false statements he made that defame or disparage PainTEQ and to remove any such false statements that have been anywhere on the internet, including websites, social media and messaging platforms, and blogs.

C.     Enter a declaratory judgment that Mr. Subasic's statements about PainTEQ are false and defamatory;

D.     Award PainTEQ actual damages;

E.     Award PainTEQ pre-judgment and post-judgment interest; and

F.     Award PainTEQ all further relief the Court finds just and proper.

**Count Four**
**Violation of Florida's Uniform Trade Secrets Act**
**Misappropriation of Trade Secrets by Use and Disclosure against Chad Subasic**

141.    PainTEQ realleges and incorporates by reference paragraphs 1 through 98.

142.    This is an action against Chad Subasic for misappropriation of trade secrets by use and disclosure under the Florida Uniform Trade Secrets Act, section 688.001, et seq., of the Florida Statutes.

143.    PainTEQ's trade secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, third parties, including competitors, who can obtain economic value from their acquisition or use.

144.    Mr. Subasic used, is using, or is threatening to use, and disclosed, is disclosing, or is threatening to disclose, PainTEQ's trade secrets without express or implied consent.

145.    Mr. Subasic willfully and maliciously used, is using, or is threatening to use, and disclosed, is disclosing, or is threatening to disclose, PainTEQ's trade secrets without express or implied consent.

146.    At the time of the use and disclosure, Mr. Subasic was bound by the Confidentiality, Noncompetition and Nonsolicitation Agreement attached as Exhibit A and the Confidentiality Agreement attached as Exhibit B and therefore knew or had reason to know that his knowledge of PainTEQ's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their disclosure.

147.    Mr. Subasic knew or had reason to know that he used, is using, or is threatening to use, and disclosed, is disclosing, or is threatening to disclose, PainTEQ's trade secrets through improper means.

148.    Mr. Subasic's use and disclosure of PainTEQ's trade secrets directly and proximately caused PainTEQ injury.

149.    There is no plain, speedy, or adequate remedy at law, and unless Mr. Subasic is enjoined from further misappropriating PainTEQ's trade secrets, PainTEQ will be irreparably injured.

150.    Mr. Subasic's use and disclosure of PainTEQ's trade secrets will directly and proximately cause PainTEQ injury.

151.    To the extent they can be calculated, PainTEQ has also suffered actual damages in the form of the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss.

24

152.    PainTEQ is entitled to an award of its attorneys' fees and costs under section 688.005 of the Florida Statutes.

WHEREFORE, PainTEQ demands the Court to:

A.    Order Mr. Subasic to return to PainTEQ any and all data, documents, information and other materials that constitute or comprise confidential and proprietary information, including PainTEQ's trade secrets, or property of PainTEQ;

B.    Enjoin Mr. Subasic from using or disclosing any and all data, documents, information and other materials that constitute or comprise PainTEQ's confidential and proprietary information, including PainTEQ's trade secrets;

C.    Enter judgment in favor of PainTEQ;

D.    Award PainTEQ damages in an amount to be determined at trial that exceeds $30,000.00, which includes:

      i.    the actual loss caused by the misappropriation;

      ii.    the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss;

      iii.    a reasonable royalty; and

      iv.    exemplary damages in an amount of twice the total of the actual loss, the unjust enrichment, and the reasonable royalty;

E.    Award PainTEQ its reasonable attorneys' fees and costs under section 688.005 of the Florida Statutes;

F.    Award PainTEQ interest;

G.    Award PainTEQ all further relief the Court finds just and proper.

**Count Five**
**Tortious Interference with a Business Relationship against Omnia Medical**

153.    PainTEQ realleges and incorporates by reference paragraphs 1 through 98.

154.    This is an action against Omnia Medical for tortious interference with a business relationship.

155.    At all relevant times, PainTEQ has maintained business relationships with its customers and referral sources.

156.    At all relevant times, Omnia Medical has had knowledge of PainTEQ's business relationships with its customers and referral sources.

157.    Omnia Medical has engaged in, is engaging in, or is threatening to engage in, intentional and unjustified interference with PainTEQ's business relationships with its customers and referral sources.

158.    Omnia Medical's breach of these relationships has directly and proximately caused PainTEQ injury. There is no plain, speedy, or adequate remedy at law, and unless Omnia Medical is enjoined from further tortious interference with PainTEQ's business relationships, PainTEQ will be irreparably injured.

159.    To the extent they can be calculated, PainTEQ has also suffered actual damages, plus consequential and other damages flowing from Omnia Medical's tortious interference with PainTEQ's business relationships in an amount to be determined at trial, plus interest and costs.

WHEREFORE, PainTEQ demands the Court to:

A.    Enjoin Omnia Medical from engaging in any and all tortious interference with PainTEQ's business relationships with its customers and referral sources;

26

B.      Enter judgment in favor of PainTEQ;

C.      Award PainTEQ damages in an amount to be determined at trial that exceeds $30,000.00, and which includes:

      i.      compensatory damages; and

     ii.      consequential damages, including lost profits; and

D.      Award PainTEQ all further relief the Court finds just and proper.

**Count Six**
**Violation of Florida's Uniform Trade Secrets Act**
**Misappropriation of Trade Secrets by Acquisition and Use against Omnia Medical**

160.    PainTEQ realleges and incorporates by reference paragraphs 1 through 98.

161.    This is an action against Omnia Medical for misappropriation of trade secrets by acquisition and use under the Florida Uniform Trade Secrets Act, section 688.001, et seq., of the Florida Statutes.

162.    PainTEQ's trade secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, third parties, including competitors, who can obtain economic value from their acquisition or use.

163.    Omnia Medical acquired, is acquiring, or is threatening to acquire, and used, is using, or is threatening to use, PainTEQ's trade secrets without express or implied consent.

164.    Omnia Medical willfully and maliciously acquired, is acquiring, or is threatening to acquire, and used, is using, or is threatening to use, PainTEQ's trade secrets without express or implied consent.

165.    At the time of the acquisition and use, the source of the trade secrets — the terminated PainTEQ employees, including Mr. Subasic, were bound by Confidentiality,

Noncompetition and Nonsolicitation Agreements, including the one attached as Exhibit A, and therefore Omnia Medical knew or had reason to know that its knowledge of PainTEQ's trade secrets was acquired and used under circumstances giving rise to a duty to maintain their secrecy or limit their acquisition or use.

166.    Omnia Medical knew or had reason to know that it acquired, is acquiring, or is threatening to acquire, and used, is using, or is threatening to use, PainTEQ's trade secrets through improper means.

167.    Omnia Medical's acquisition and use of PainTEQ's trade secrets directly and proximately caused PainTEQ injury.

168.    There is no plain, speedy, or adequate remedy at law, and unless Omnia Medical is enjoined from further misappropriating PainTEQ's trade secrets, PainTEQ will be irreparably injured.

169.    Omnia Medical's acquisition and use of PainTEQ's trade secrets will directly and proximately cause PainTEQ injury.

170.    To the extent they can be calculated, PainTEQ has also suffered actual damages in the form of the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss.

171.    PainTEQ is entitled to an award of its attorneys' fees and costs under section 688.005 of the Florida Statutes.

WHEREFORE, PainTEQ demands the Court to:

A.      Order Omnia Medical to return to PainTEQ any and all data, documents, information and other materials that constitute or comprise confidential and proprietary information, including PainTEQ's trade secrets, or property of PainTEQ;

B.      Enjoin Omnia Medical from acquiring or using any and all data, documents, information and other materials that constitute or comprise Omnia Medical's confidential and proprietary information, including PainTEQ's trade secrets;

C.      Enter judgment in favor of PainTEQ;

D.      Award PainTEQ damages in an amount to be determined at trial that exceeds $30,000.00, which includes:

       i.      the actual loss caused by the misappropriation;

      ii.     the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss;

     iii.     a reasonable royalty; and

     iv.     exemplary damages in an amount of twice the total of the actual loss, the unjust enrichment, and the reasonable royalty;

E.      Award PainTEQ its reasonable attorneys' fees and costs under section 688.005 of the Florida Statutes;

F.      Award PainTEQ interest;

G.      Award PainTEQ all further relief the Court finds just and proper.

## **WAIVER OF JURY TRIAL**

Under Section 4(b) of the Confidentiality, Noncompetition and Nonsolicitation Agreements, Mr. Subasic waived his right to jury trial in this action.

Respectfully submitted,

HILL, WARD & HENDERSON

/s/*Gregory P. Brown*

Gregory P. Brown
Florida Bar No. 98760
Ryan J. Leuthauser
Florida Bar No. 99517
Ryan M. Guerin
Florida Bar. No. 1011326
HILL WARD HENDERSON, P.A.
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602
Tel:  (813) 221-3900; Fax: (813) 221-2900
Gregory.Brown@hwhlaw.com
Ann-Marie.Hallett@hwhlaw.com
Ryan.Leuthauser@hwhlaw.com
Debra.Whitworth@hwhlaw.com
Ryan.Guerin@hwhlaw.com
Erika.Vap@hwhlaw.com
*Attorneys for PainTEQ*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 2, 2020 the foregoing was electronically filed with the Clerk of the Court by utilizing the Florida Courts E-Filing Portal, which will send a notice of electronic filing to all counsel of record.

/s/*Gregory P. Brown*
Attorney

30

## <u>VERIFICATION</u>

My name is Christopher Girsch. I am the President of PainTEQ, LLC. I am authorized to make this verification on behalf of PainTEQ, Plaintiff in this action. Under penalties of perjury, I declare that I have read the foregoing Verified Amended Complaint and that the facts stated in it are true to the best of my knowledge and belief. My declaration is based on my personal knowledge or knowledge I have obtained by a review of PainTEQ's records as kept in the ordinary course of business.

Christopher Girsch



## CONFIDENTIALITY, NONCOMPETITION AND NONSOLICITATION AGREEMENT

This **CONFIDENTIALITY, NONCOMPETITION AND NONSOLICITATION AGREEMENT** (this "Agreement") is dated as of _August 6th_, 2019, by and between [_Chad Subasic_] ("Restricted Party") and PAIN TEQ, LLC, a Florida limited liability company (the "Company").

1.      **Restrictive Covenants.**  The Restricted Party shall not do any of the following, directly or indirectly or in any capacity, either for Restricted Party or on behalf of any other person:

(a) After termination of Restricted Party's association with the Company for any reason, Restricted Party shall not retain or remove any Proprietary Information (as defined below);

(b) Except in the course of performing Restricted Party's duties to the Company, Restricted Party shall not use or disclose to any person any material information (written or unwritten) concerning trade secrets, proprietary data, or other valuable confidential or business information relating to the business or financial affairs of the Company (collectively, "Proprietary Information");

(c) Restricted Party understands that the Company will receive from third parties heath information and confidential information ("Third-Party Information"). Restricted Party will hold Third-Party Information in confidence and will not disclose to anyone (other than personnel of the Company who need to know such information in connection with their work for the Company) or use, except in connection with Restricted Party's work for the Company, Third-Party Information;

(d) During the period that Restricted Party is associated with the Company and for a period of twenty-four (24) months after termination of Restricted Party's association for any or no reason (the "Restricted Period"), Restricted Party shall not persuade or attempt to persuade any physician or other health care provider, agent, supplier, manufacturer, customer, contractor, prospective physician or customer or other person who has a business relationship with the Company to cease to do business with the Company, reduce the amount of business that it historically has done with the Company, or otherwise adversely alter its business relationship with the Company;

(e) During the Restricted Period, Restricted Party shall not engage in any business, acquire an interest in any business, or serve as an agent, lender, manager, owner, officer, director, employee, investor, consultant, representative, or independent contractor of any business that directly or indirectly competes with the Company anywhere in the United States of America; and

(f) During the Restricted Period, Restricted Party shall not hire, offer, recruit, solicit, influence, or attempt to influence, any person who either is an employee or independent contractor of the Company or has been an employee or independent contractor of the Company during the last six (6) months Restricted Party was associated with the

EXHIBIT A

Company to terminate his employment or association with the Company for the purpose of working for Restricted Party or any other person.

If the Company requests the return of any Proprietary Information, Restricted Party promptly (and in any event within five (5) days) shall return to the Company all Proprietary Information. Restricted Party shall not place any Proprietary Information on any personal storage devices.

Restricted Party acknowledges, stipulates, and agrees that the preceding restrictions are reasonable as to geographical area, time, and line of business and are reasonably necessary to protect legitimate business interests of the Company. To the extent the duration, geographical area, or line of business of any of the preceding restrictions would cause them to be unenforceable in a particular jurisdiction, the restrictions automatically will be reformed for purposes of enforcement in that jurisdiction to a duration, geographical area, or line of business that is valid and enforceable in that jurisdiction.

**2.  Intellectual Property.**  If Restricted Party during the term of his association with the Company generates, authors, conceives, develops, makes, reduces to practice or contributes to any intellectual property related to the Company's business, Restricted Party acknowledges that such Intellectual Property is and shall be the exclusive property of the Company. Any copyrightable work prepared in whole or in part by Restricted Party that qualifies as intellectual property shall to be deemed "a work made for hire" to the maximum extent permitted under Section 201(b) of the 1976 Copyright Act as amended, and the Company shall own all of the rights comprised in the copyright therein.

**3.    Remedies.**  Restricted Party stipulates that a breach by Restricted Party of any of the covenants in Sections 2 or 3 of this Agreement will diminish the value of the Company and will cause irreparable and continuing injury to the Company for which an adequate legal remedy will not exist. Accordingly, Restricted Party stipulates that, if Restricted Party breaches any of the covenants in Sections 2 or 3 of this Agreement, without limiting or excluding any other available remedy, the Company will be entitled to entry by a court having jurisdiction of an order granting specific performance or temporary injunctive relief, without proof of actual monetary damage or an inadequate remedy at law, and reimbursement from Restricted Party of all reasonable costs incurred by the Company in enforcing the covenant.

**4.  Legal Matters.**

(a)    Jurisdiction and Venue.  The laws of the State of Florida and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions, govern the validity, enforcement, construction, and interpretation of this Agreement. Restricted Party and the Company (i) consent to the personal jurisdiction of the state and federal courts having jurisdiction in Hillsborough County, Florida, (ii) stipulate that the exclusive venue for any legal proceeding arising out of this Agreement is Hillsborough County, Florida, for a state court proceeding, or the federal court having jurisdiction in Hillsborough County, Florida, for a federal court proceeding, and (iii) waive any defense, whether asserted by motion or

pleading, that Hillsborough County, Florida, or the federal court having jurisdiction in Hillsborough County, Florida is an improper or inconvenient venue.

(b)     Waiver of Trial By Jury.  **RESTRICTED PARTY AND COMPANY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT TO A JURY TRIAL IN ANY LAWSUIT BETWEEN THEM THAT ARISES AT ANY TIME OUT OF THIS AGREEMENT OR RESTRICTED PARTY'S ASSOCIATION WITH THE COMPANY, WHETHER AT LAW OR IN EQUITY, WHETHER BASED ON A CLAIM OR COUNTERCLAIM ARISING BEFORE OR AFTER THE EFFECTIVE DATE OF THIS AGREEMENT, REGARDLESS OF THE NATURE OF THE CLAIM OR COUNTERCLAIM, AND INCLUDING CLAIMS UNDER TORT, CONTRACT, CORPORATE, AND EMPLOYMENT LAWS.**

(c)     Costs.  In any arbitration or legal proceeding between Restricted Party and the Company arising out of this Agreement, the losing party shall reimburse the prevailing party, on demand, for all costs incurred by the prevailing party in enforcing, defending, or prosecuting this Agreement.

5.     **Assignment; Successors.**  Restricted Party shall not assign Restricted Party's rights or delegate any of Restricted Party's obligations under this Agreement.  The Company may assign its rights under this Agreement without Restricted Party's consent to any assignee or successor in interest of its business, whether pursuant to a sale, merger, contribution of its assets and liabilities, or sale or exchange of all or substantially all the assets or outstanding capital stock or other equity interests of the Company.  This Agreement is binding on, and inures to the benefit of, the Company's authorized assignees and successors.

6.     **Waiver; Amendment.**  A waiver or amendment of this Agreement will be valid and effective only if evidenced by a writing that is signed by or on behalf of the party against whom the waiver or amendment is sought to be enforced.  No delay or course of dealing by a party to this Agreement in exercising any right or remedy under this Agreement will operate as a waiver of any right or remedy of that party.  The failure at any time of either party to require performance by the other party of any provision of this Agreement will in no way affect the party's right thereafter to enforce the provision or this Agreement.  Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law.  If a court determines that a covenant or agreement in this Agreement is unenforceable, that covenant or agreement will be deemed separable from the remaining covenants and agreements in this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that covenant or agreement to other circumstances to which it is enforceable.

7.     **Recurring Words.**  As used in this Agreement, (a) the words "association with the Company" or "associated with the Company" as it relates to Restricted Person includes Restricted Person's role as member, employee, independent contractor, or any other capacity in which the Restricted Person may provide services to the Company and that may apply at any time and from time to time, (b) the word "person" includes, in addition to a natural person, a trust, group,

3

syndicate, corporation, cooperative, association, partnership, business trust, joint venture, limited liability company, unincorporated organization, and a government, a public body or authority, and any governmental body, agency, authority, department, or subdivision, whether domestic or foreign or local, state, regional, or national, and (c) the word "costs" includes all fees, costs, and expenses of experts, attorneys, paralegals, mediators, arbitrators, witnesses, and supersedeas bonds, whether incurred before or after demand or commencement of legal proceedings.

8.    **Notices.**  Every notice, demand, consent, or other communication required or permitted under this Agreement will be valid only if it is in writing (whether or not this Agreement expressly states that it must be in writing) and delivered personally or by commercial overnight courier, or first-class, postage-prepaid, United States mail (whether or not certified or registered, and regardless of whether a return receipt is requested or received by the sender), and addressed to the addresses for the parties listed on their respective signature pages to this Agreement (or at such other address as a party provides notice to the other party).  A validly given notice, demand, consent, or other communication will be effective on the earlier of its receipt, if delivered personally or commercial courier, or the third day after it is postmarked by the United States Postal Service, if delivered by first-class, postage-prepaid, United States mail.

9.    **Execution; Complete Agreement.**  The titles and headings preceding the text of the sections of this Agreement are inserted solely for convenient reference and neither constitutes a part of this Agreement nor affect its meaning, interpretation, or effect.  The parties may execute this Agreement in counterparts.  Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.  This Agreement will become effective, as of its stated date of execution, when each party has signed and delivered a counterpart of it to the other party.  This Agreement records the final, complete, and exclusive understanding of the parties with respect to the matters addressed in it.

10.   **Restricted Party's Cooperation.**  While Restricted Party is associated with the Company and thereafter, Restricted Party shall cooperate with the Company in any internal investigation or administrative, regulatory or judicial proceeding as reasonably requested by the Company.

11.   **No Strict Construction.**  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

**RESTRICTED PARTY ACKNOWLEDGES THAT RESTRICTED PARTY HAS CAREFULLY READ THIS AGREEMENT, WAS AFFORDED SUFFICIENT OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL OF RESTRICTED PARTY'S CHOICE AND TO ASK QUESTIONS AND RECEIVE SATISFACTORY ANSWERS REGARDING THIS AGREEMENT, UNDERSTANDS RESTRICTED PARTY'S RIGHTS AND OBLIGATIONS UNDER IT, AND SIGNED IT OF RESTRICTED PARTY'S OWN FREE WILL AND VOLITION.**

4

**SIGNATURE PAGE**
**TO**
**CONFIDENTIALITY, NONCOMPETITION AND NONSOLICITATION AGREEMENT**

Executed as of the date first set forth above by:

**Company**

**PAIN TEQ, LLC,**
a Florida limited liability company

By:  OMT Group LLC, a Florida limited liability
company, as manager

By:_____
    Name:   Sean LaNeve
    Title:   Manager

By:  Colty Investments Group, Inc., a Florida
corporation, as manager

By:_____
    Name:   Christopher Girsch
    Title:   Manager

Address:

3300 Henderson Blvd., Suite 106
Tampa, Florida 33609

**Restricted Party**

_____
Print Name:_____ Chad Subes. C

Address:

███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

12914623v1

B

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement") is made and entered into as of _July 19th_ 2019 ("**Effective Date**"), by and between PAIN TEQ, LLC, a Florida limited liability company ("**Company**"), and _Chad Subsic_ ("**Recipient**") (the Company and Recipient, collectively, the "**Parties**").

1.      Definition of Confidential Information.  "**Confidential Information**" as used in this Agreement shall mean information concerning Company's business, property or technology that has commercial and other value, is not generally known to the public and is disclosed by Company to Recipient.

2.      Nondisclosure and Nonuse Obligation.  Recipient shall not disclose any Confidential Information of Company to any third party, and shall only use Confidential Information of Company in connection with its internal evaluations of a proposed transaction or business relationship between the Parties.  Recipient will treat all Confidential Information with the same degree of care as it accords its own Confidential Information, but in no case less than reasonable care.

3.      Exclusions from Nondisclosure and Nonuse Obligations.  Recipient's obligations under Paragraph 2 shall not apply to Confidential Information that is (a) in the public domain at or subsequent to the time communicated to Recipient by Company through no fault of Recipient or (b) approved for release in writing by the Company.  In addition, any disclosure of any portion of Confidential Information either (i) in response to a valid order by a court or other governmental body, or (ii) otherwise required by law, shall not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that, to the extent legally permissible and reasonably possible, Recipient shall provide prompt prior written notice thereof to Company to enable Company (at its sole expense) to seek a protective order or otherwise prevent such disclosure.

4.      Ownership. All Confidential Information shall remain the property of Company, and no license or other rights to Recipient is granted or implied hereby.

5.      Injunctive Relief.  The Parties acknowledge and agree that money damages may not be a sufficient remedy for any breach of their respective obligations under this Agreement and that each shall be entitled to seek injunctive relief as a remedy for any such breach by the other party.  Such remedy will not be deemed the exclusive remedy for a breach of Recipient's obligations under this Agreement, but will be in addition to all other available legal and equitable remedies.

6.      Term.  This Agreement will govern all communications from Company to Recipient from the Effective Date.  Recipient's obligations with respect to the Confidential Information hereunder shall continue in full force and effect for a period of one (1) year following the Effective Date.  Upon Company's written request, Recipient shall, at its sole election, return or destroy all Confidential Information received by the Company or its representative.

7.      Binding Effect; Counterparts.  This Agreement will benefit and be binding upon the parties and their respective successors and assigns.  This Agreement may be executed in one or more counterparts, each of which is an original, but taken together constituting one and the same instrument.  Execution of a facsimile copy shall have the same force and effect as execution of an original, and a facsimile signature shall be deemed an original and valid signature.

8.      Non-Waiver; Modification.  No failure or delay by either party in exercising any right, power, or remedy under this Agreement will operate as a waiver of any such right, power or remedy.  No waiver or modification of any provision of this Agreement will be effective unless in writing and signed by both parties.

9.      Governing Law; Venue; Expenses.  This Agreement shall be governed by and construed in accordance with the laws of Florida without regard to the conflicts of laws provisions thereof.  Exclusive

EXHIBIT B

jurisdiction and venue for any action arising under this Agreement is in the federal and state courts located in Hillsborough County, Florida, and both parties hereby consent to such jurisdiction and venue for this purpose. The prevailing party in any action to enforce this Agreement shall be entitled to reimbursement of all reasonable attorneys' fees and expenses incurred in connection with such action.

10.   Entire Agreement. This Agreement constitutes the entire agreement and understanding of the parties relating to the subject matter hereof and supersedes all prior and contemporaneous agreements, negotiations and understandings between the parties, both oral and written.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"Company"

PAIN TEQ, LLC

By: _____

Name: _____Sean LaNeve_____

Title: _____CEO_____

"Recipient"

Print Name:

_____Chad Srbasic_____

C



EXHIBIT C

D

Hey Charles, I have a PainTEQ case and I think chad is no longer with you. Our team was getting word he was marketing a diff product but I want to use Linq. Who can I call as my rep for the case? I do want someone seasoned

EXHIBIT D

E

taking a look at this , any savings will be considered, I will be sending in different texts what he sent me
This is from chad
Very similar system. We will not use the drill and use one implant. Same style implant also. I sent you the email. I also am able to discount. I was able to give you $Redacted. Your old price was $Redacted.



I think is the same technique I will ask him if more training is needed

F



**Marty Jordan**
To: Redacted                >

11:33 AM

# Omnia SI Fusion System

Hey Dr Redacted ,

I hope you are hanging in there and all are safe and healthy.  I'm not sure if I had mentioned to you that Painteq closed their doors right after the news of Covid-19.

I wanted you to know that I will be carrying a very like system which actually leaves behind the same implant from the same supplier.  I have attached the procedure video.  You have the option to use a drill or just quickly punch out a notch for the implant.  Let me know your thoughts and if we can contact Marolyn to set up the surgi center.


Thanks again,
Marty.

EXHIBIT F

G

Hey Devin it's Kyle Wolfe, would you be interested in partnering with my self and Omnia medical?  I heard about PainTeq and I think you would be really happy with Omnia.  No worries man just thought I would reach out.  Have a great day!

EXHIBIT G