## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PAINTEQ, LLC,

      Plaintiff,

vs.                                                            Case No. 8:20-cv-02805-VMC-AAS

OMNIA MEDICAL, LLC,

      Defendant.

_____/

## SECOND AMENDED COMPLAINT

PainTEQ, LLC, sues Omnia Medical, LLC, and alleges as follows:

### I.    Jurisdiction, Parties, and Venue

1.    The Court has subject matter jurisdiction under agreements between the Parties and, under 28 U.S.C. § 1332, because there is diversity of citizenship of the parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest, and costs.

2.    PainTEQ, LLC is a Florida limited liability company with its principal place of business in Hillsborough County, Florida. PainTEQ's members are Florida entities, including a Florida limited liability company whose member is a Florida citizen.

3.    Omnia Medical, LLC is an Ohio limited liability company with its principal place of business in Morgantown, West Virginia. Omnia's members are citizens of Ohio, West Virginia, and California.

4.      The Court has personal jurisdiction over Omnia because it operates, conducts, transacts, engages in, or carries on a business or business venture in Florida, is registered to do business in Florida, appointed a registered agent in Florida, engaged and is engaging in tortious acts in Florida, and caused and is causing injury to PainTEQ in Florida.

5.      Venue is proper in this District because the causes of action accrued in this District.

## II.      General Allegations

6.      This action seeks damages and injunctive relief for breaches of contracts with PainTEQ, misappropriation of PainTEQ's trade secrets, tortious interference with PainTEQ's business relationships, and defamatory statements made about PainTEQ.

### A.      PainTEQ's vision for interventional pain management.

7.      PainTEQ provides services and solutions to the interventional pain management community, including interventional spine specialist physicians.

8.      Due to its substantial investment, innovation, and leadership, PainTEQ enables interventional spine specialist physicians to provide their patients with pain-relieving solutions that traditionally only spinal surgeons could.

9.      Today, these solutions include PainTEQ's LinQ™ posterior joint fusion procedure.

10.      This innovative procedure allows for fusion and stabilization of the sacroiliac (SI) joint in patients where appropriate non-surgical treatment has failed.

11.     Traditionally, the manufacturers, distributors, and sellers of SI joint fusion implants and instrumentation avoided the interventional pain management community and instead focused primarily on spinal surgeons.

12.     PainTEQ envisioned that with the proper training, education, and support, interventional spine specialists could perform SI joint fusions and deliver optimal patient outcomes.

13.     To bring its vision to fruition, PainTEQ initially served as the exclusive distributor for Omnia implants and instrumentation for SI joint fusion procedures in the interventional pain community.

14.     Omnia was skeptical of PainTEQ's vision, but since it focused its marketing efforts on orthopedic surgeons and not interventional pain management physicians, Omnia was willing to reap the benefits of any success that PainTEQ might achieve.

### B.     Omnia's inability to meet demand created by PainTEQ gives rise to the LinQ™ procedure.

15.     PainTEQ achieved far more success than Omnia apparently expected.

16.     SI joint fusion procedures proved extremely popular in the interventional pain community.

17.     Omnia struggled to supply enough implants to meet the demand generated by PainTEQ's success.

18.     Omnia's struggles forced PainTEQ, on several occasions, to ask physicians to postpone procedures.

19.     PainTEQ provided Omnia multiple opportunities to correct its supply deficiencies, but ultimately it failed to do so.

20.     Faced with ever-increasing demand for SI joint fusion procedures and an unreliable supplier, PainTEQ was forced to part ways with Omnia.

21.     In the process of selecting a new supplier, PainTEQ took the opportunity to improve its entire SI joint fusion approach and procedure.

22.     The current generation resulting from those improvements is the LinQ™ procedure.

23.     Unlike the SI joint fusion procedure performed using the Omnia implants and instrumentation, the LinQ™ procedure uses one implant instead of two, does not drill into the patient's bone, and does not require mounting of the instrumentation to the operating table during the procedure.

24.     Physicians recommend the LinQ™ procedure and prefer it to those offered by PainTEQ's competitors because it is minimally invasive, implants no metal, features a short procedure time, promotes a fast recovery, and enjoys effective results.

25.     To provide the LinQ™ procedure, PainTEQ partners with two suppliers: one for the implant and one for the instrumentation.

26.     To help ensure the best outcome for each and every procedure, including the LinQ™ procedure, PainTEQ trains and supports physicians in the PainTEQ program.

27.     This includes bio-skills training and certification for PainTEQ procedures, including the LinQ™ procedure, marketing literature and demonstrative aids to

support patient education, patient leads, and coding, billing, authorization, and reimbursement support.

### C.   PainTEQ's sales team

28.    To support physicians in the PainTEQ program and their staff, and to help sell solutions like the LinQ™ procedure to the interventional pain community, PainTEQ employs a sales team.

29.    PainTEQ also partners with distributors with existing relationships to sell PainTEQ solutions.

30.    Individuals including Joseph King, Jason Loerzel, Melissa Walker, were employed by PainTEQ as members of PainTEQ's sales team, as was Chad Subasic.[1]

31.    PainTEQ employs a team of clinical support personnel to help train and support physicians in the PainTEQ program, as well as members of the PainTEQ sales team.

32.    These clinical support personnel attend and participate in physicians' initial surgeries in the PainTEQ program and provide ongoing support.

33.    When new sales team members join PainTEQ, they receive significant onboarding training, education, and support, including training and education on PainTEQ's services and solutions and how to market them.

---

[1] Mr. Subasic was the original Defendant of PainTEQ's claims in this lawsuit. After the circuit court entered a temporary injunction against him, Mr. Subasic agreed to reimburse PainTEQ's legal fees and costs and to the entry of a permanent injunction against him, in exchange for the dismissal of his claims with PainTEQ.

34.    PainTEQ trains and educates its sales team members to identify and recruit physicians for the PainTEQ program, who serve as important PainTEQ referral sources.

35.    PainTEQ also trains and educates its sales team members to identify and recruit customers for the PainTEQ program, which include ambulatory surgery centers, hospital outpatient surgery centers, and hospitals.

36.    To promote the success of its new sales team members, PainTEQ provides them with a portfolio of physicians in the PainTEQ program that are identified, recruited, and developed by PainTEQ.

37.    New PainTEQ sales team members also attend mock surgeries with PainTEQ clinical support personnel to obtain a complete understanding of PainTEQ's services, solutions, and procedures prior to engaging with physicians and patients.

38.    PainTEQ shares substantial information with its sales team members, including information about PainTEQ's solutions, services, procedures, systems, training, education, marketing, and pricing, and lists of its current and prospective physicians and customers in the PainTEQ program.

39.    PainTEQ invests substantially in developing and maintaining this information.

40.    This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, competitors who can obtain economic value from its disclosure or use.

41.    PainTEQ views this information as its confidential, proprietary, and trade secret information.

42.    The healthcare industry, including the market for interventional pain management, is highly competitive.

43.    PainTEQ's success in introducing SI joint procedures to the interventional pain management community, including with the LinQ™ procedure, has made that competition even more pronounced.

44.    As a result, PainTEQ takes appropriate measures that are reasonable under the circumstances to protect its confidential, proprietary, and trade secret information and prevent its disclosure.

45.    These measures include restricting access to authorized users only and requiring password-protected access with dual authentication.

46.    These measures include nondisclosure provisions in agreements with PainTEQ business partners, including physicians and customers.

47.    These measures also include, as a condition of employment, that PainTEQ employees enter into agreements with restrictive covenants that protect PainTEQ's confidential, proprietary, and trade secret information.

48.    PainTEQ's employees, including Mr. King, Mr. Loerzel, Ms. Walker, Mr. Subasic, and two other former PainTEQ employees, Thomas Batton and Kyle Wolfe, entered into these agreements.

49.     The agreements entered into by Mr. Loerzel, Ms. Walker, Mr. Subasic, Mr. Batton, and Mr. Wolfe—Confidentiality, Noncompetition and Nonsolicitation Agreements—are attached as Exhibits A through E.

50.     As their titles suggest, the agreements between PainTEQ sales team members and PainTEQ contain confidentiality, noncompetition, and nonsolicitation restrictive covenants.

51.     Section 1(a) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that "after termination of" employment with PainTEQ, the employee "shall not retain or remove any Proprietary Information (as defined below)." *See, e.g.*, Exhibit A.

52.     Section 1(b) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that the employee "shall not use or disclose to any person any material information (written or unwritten) concerning trade secrets, proprietary data, or other valuable confidential or business information relating to the business or financial affairs of the Company (collectively, 'Proprietary Information')." *Id.*

53.     Section 1 of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that during employment with PainTEQ and for two years after termination of employment "for any or no reason," if:

> the Company requests the return of any Proprietary Information, Restricted Party promptly (and in any event within five (5) days) shall return to the Company all Proprietary Information. Restricted

> Party shall not place any Proprietary Information on any personal
> storage devices.

*Id.*

54.     Section 1(d) of the Confidentiality, Noncompetition and Nonsolicitation
Agreement states that the employee:

> shall not persuade or attempt to persuade any physician or other
> health care provider, agent, supplier, manufacturer, customer,
> contractor, prospective physician or customer or other person who
> has a business relationship with the Company to cease to do business
> with the Company, reduce the amount of business that it historically
> has done with the Company, or otherwise adversely alter its business
> relationship with the Company.

*Id.*

55.     Section 1(e) of the Confidentiality, Noncompetition and Nonsolicitation
Agreement states that during employment with PainTEQ and for two years after
termination of employment "for any or no reason," the employee:

> shall not engage in any business, acquire an interest in any business,
> or serve as an agent, lender, manager, owner, officer, director,
> employee, investor, consultant, representative, or independent
> contractor of any business that directly or indirectly competes with the
> Company anywhere in the United States of America.

*Id.*

56.     Section 1(f) of the Confidentiality, Noncompetition and Nonsolicitation Agreement states that during employment with PainTEQ and for two years after termination of employment "for any or no reason," the employee:

> shall not hire, offer, recruit, solicit, influence, or attempt to influence, any person who either is an employee or independent contractor of the Company or has been an employee or independent contractor of the Company during the last six (6) months Restricted Party was associated with the Company to terminate his employment or association with the Company for the purpose of working for Restricted Party or any other person.

*Id.*

57.     The restrictive covenants contained in the Confidentiality, Noncompetition and Nonsolicitation Agreement are reasonable and no greater than necessary under the circumstances to protect PainTEQ's legitimate business interests, including the Confidential Information and Proprietary Information, the employees received during their time with PainTEQ.

58.     The restrictive covenants contained in the Confidentiality, Noncompetition and Nonsolicitation Agreement are reasonable and no greater than necessary under the circumstances to protect PainTEQ's legitimate business interests, including substantial relationships with prospective and existing customers, referral sources, and associated goodwill.

59.    These restrictive covenants prevented, and continue to prevent, these sales team members from competing with PainTEQ, from interfering with any of PainTEQ's business relationships and customer and referral source goodwill, from improperly using, retaining, or disclosing PainTEQ's confidential and proprietary information, and from soliciting its employees.

### D.    Omnia seized on the adversity caused by the COVID-19 pandemic to seek revenge against PainTEQ.

60.    Despite the training, education, and support provided by PainTEQ, Ms. Walker, Mr. Subasic, and other sales team members often failed to meet their sales goals.

61.    As a result, two former sales team members left PainTEQ in October 2019, and another's employment was terminated in January 2020.

62.    Due to multiple job performance issues in addition to failing to meet sales goals, on March 2, 2020, PainTEQ issued Mr. Subasic with a performance improvement plan, or PIP.

63.    The PIP required Mr. Subasic to meet several improved job performance expectations within the following 90 days.

64.    The PIP indicated that termination of employment could occur if Mr. Subasic did not make significant job performance improvements or if he shared or complained about the PIP.

65.     In the weeks following the issuance of the PIP to Mr. Subasic, like the entire medical industry, PainTEQ was significantly and negatively impacted by the Coronavirus Disease 2019 (COVID-19) outbreak.

66.     PainTEQ continued and continues to support elective procedures where permitted throughout the COVID-19 pandemic, but many jurisdictions, including Florida, prohibited such procedures.

67.     As a result, PainTEQ was forced to take several steps to preserve its business.

68.     PainTEQ continued to employ several members of its sales and clinical support teams and other personnel but was forced to furlough and terminate the employment of others, with the plan to re-hire several once it was able to do so.

69.     On April 16, 2020, PainTEQ re-hired eight employees, including Mr. Loerzel.

70.     Given their prior job performance issues, PainTEQ did not re-hire and instead terminated other employees, including Ms. Walker and Mr. Subasic.[2]

71.     PainTEQ was concerned that the terminated employees would be tempted to use the valuable training, education, and other confidential and proprietary information they received from PainTEQ—including information about PainTEQ's current and prospective customers and referral sources—to improperly compete against it.

72.     PainTEQ was equally concerned that Omnia would view the terminated employees as easy targets to hire or otherwise associate with to improperly compete against PainTEQ.

───────────────

[2] Mr. Batton left PainTEQ for unrelated reasons in October 2019.

73.     So on April 20, 2020, PainTEQ sent the terminated employees letters to remind them of their obligations under their agreements with PainTEQ and to demand they cease and desist from any actions that violate the agreements and preserve relevant evidence of any violation. The letter PainTEQ sent to Ms. Walker is attached as Exhibit F.[3]

74.     Nevertheless, amidst the struggle of PainTEQ and countless other businesses to survive the COVID-19 pandemic—including by retaining valuable employees, preserving valuable business relationships, and attempting to continue to serve patients—Omnia launched its revenge campaign.

75.     Omnia was upset when PainTEQ parted ways with it over its struggle to supply enough implants to meet the demand generated by PainTEQ's success.

76.     Omnia was shocked by PainTEQ's success and realized its skepticism of PainTEQ's vision for bringing SI joint fusion to the interventional pain community was a grave mistake.

77.     But rather than compete legitimately through the same or better investment, innovation, and leadership shown by PainTEQ, Omnia took an illicit approach to capitalize on PainTEQ's success.

---

[3] At that time, PainTEQ had already sued Mr. Subasic, and its investigation had uncovered his efforts, among other things, to redirect business from PainTEQ to Omnia. So on April 17, 2020, PainTEQ sent Omnia a letter to: (a) inform it of PainTEQ's lawsuit against Mr. Subasic and the prospect of adding Omnia as a defendant to the litigation; (b) demand Omnia cease and desist from any illicit conduct, including the use "of any of PainTEQ's confidential and proprietary information to interfere with PainTEQ's customers, prospective customers, referral sources, and employees"; and (c) instruct Omnia to preserve all relevant evidence. A copy of the letter sent to Omnia is attached as Exhibit G. At later points, PainTEQ shared with Omnia the identity of PainTEQ's former employees and their restrictive covenant agreements.

78.     Omnia had already hired one former PainTEQ sales team member directly (now Omnia's Vice President of Sales-East)[4] and another as a distributor, in violation of their noncompetition agreements with PainTEQ.

79.     Omnia, aided by these two former PainTEQ sales team members, then recruited the other terminated PainTEQ sales team members to join Omnia.

80.     Upset at their termination by PainTEQ, some of the terminated PainTEQ sales team members were eager to join Omnia's revenge campaign.

81.     To aid in this revenge campaign, the terminated PainTEQ sales team members shared PainTEQ's confidential, proprietary, and trade secret information with Omnia.

82.     Omnia and the terminated PainTEQ sales team members used this information to target the physicians and customers in PainTEQ's program and those that PainTEQ has been actively recruiting.

83.     Physicians and customers in PainTEQ's program have been contacted and provided with false and defamatory information about PainTEQ and encouraged to work with Omnia instead of PainTEQ. A copy of an announcement for a webinar evidencing Omnia's efforts to target a physician in PainTEQ's program and a physician PainTEQ had recruited for its program is attached as Exhibit H.

84.     One physician in PainTEQ's program was contacted and provided with false and defamatory information, including that PainTEQ had announced that it needed

---

[4] Omnia hired Thomas Batton for this role.

to shut down its operations, and encouraged to use Omnia's SI joint fusion system instead of PainTEQ's.

85.     Mr. Subasic contacted a physician in PainTEQ's program and provided false and defamatory information about PainTEQ, including that PainTEQ had changed its name and that the physician should still contact Mr. Subasic for upcoming procedures.

86.     Mr. Subasic contacted physicians in PainTEQ's program and, by improperly using PainTEQ's confidential and proprietary pricing information, encouraged the physicians to switch to Omnia's SI joint fusion system, including by undercutting PainTEQ's pricing. A copy of a text message evidencing Mr. Subasic's efforts is attached as Exhibit I.

87.     At least one physician in PainTEQ's program has done so.

88.     Mr. Subasic, by improperly using PainTEQ's confidential and proprietary pricing information, persuaded a physician in PainTEQ's program to contact one of PainTEQ's largest customers and encourage it to switch to Omnia's SI joint fusion system by undercutting PainTEQ's pricing. A copy of a text message evidencing Mr. Subasic's efforts is attached as Exhibit J.

89.     Another terminated PainTEQ sales team member contacted a physician in PainTEQ's program and encouraged the physician to end the physician's business relationship with PainTEQ and work with Omnia instead.

90.     And another terminated PainTEQ sales team member contacted a physician in PainTEQ's program and provided false and defamatory information about

PainTEQ, including that PainTEQ was out of business, and encouraged the physician to work with Omnia instead. A copy of the text message evidencing this effort is attached as Exhibit K.

91.    PainTEQ's distributors have been contacted by Omnia and provided with false and defamatory information about PainTEQ and pressured to distribute for Omnia instead of PainTEQ.

92.    One terminated PainTEQ sales team member contacted a PainTEQ distributor and provided false and defamatory information about PainTEQ, including that Omnia had sued PainTEQ and that PainTEQ was out of business, and encouraged the distributor to distribute for Omnia instead of PainTEQ.

93.    The terminated PainTEQ sales team members have encouraged current PainTEQ employees to terminate their employment with PainTEQ and work for Omnia. A copy of a text message sent by former PainTEQ employee Kyle Wolfe evidencing these efforts is attached as Exhibit L.

94.    The terminated PainTEQ sales team members, including Mr. Subasic, have also encouraged current PainTEQ employees to terminate their employment with PainTEQ and use PainTEQ's confidential, proprietary, and trade secret information to sell for Omnia.

95.    One terminated PainTEQ sales team member has provided false and defamatory information about PainTEQ, including that PainTEQ was out of business.

96.    Mr. Subasic encouraged a current PainTEQ employee to terminate employment with PainTEQ, told the employee that if the employee terminated employment with PainTEQ, he "had a plan" and could help the employee, or the employee could get work through one of Mr. Subasic's relatives.

97.    The terminated PainTEQ employees, including Mr. Subasic, also defamed PainTEQ.[5]

98.    Mr. Subasic encouraged others, including other terminated PainTEQ sales team members, to repeat his defamatory statements, and they did so, including on the internet and in multiple LinkedIn posts.

99.    Two of the terminated PainTEQ sales team members told individuals in the interventional pain community that PainTEQ was "out of business."

100.    In sum, seizing on the adversity created by the COVID-19 pandemic, Omnia, aided by the terminated PainTEQ sales team members, including Mr. Subasic, improperly and illicitly sought revenge against Pain TEQ.

---

[5] On top of the statements made to physicians, Mr. Subasic told the current PainTEQ employee that:

    a.    PainTEQ's leadership "has no idea what they're doing";
    b.    PainTEQ's leadership "has no idea how to run a business";
    c.    PainTEQ's leadership "has no idea how to run a company";
    d.    PainTEQ has "spent all its money";
    e.    PainTEQ "doesn't have money left to pay anyone";
    f.    "There's no way PainTEQ will make it through this";
    g.    "PainTEQ is done after this";
    h.    "Once doctors find out what PainTEQ has done, there's no way PainTEQ can survive"; and
    i.    "PainTEQ has shut down its operations."

**E.** **Despite PainTEQ obtaining injunctions against Mr. Subasic, Omnia has failed to stop its illicit activities.**

101.    As a result of the breaches of PainTEQ's agreements, misappropriation of PainTEQ's trade secrets, tortious interference with PainTEQ's business relationships, and the false, materially misleading, and defamatory statements, PainTEQ sued Mr. Subasic and Omnia and moved, on an emergency basis, for a temporary injunction.[6]

102.    The circuit court set a hearing on June 11, 2020 on PainTEQ's motion for temporary injunction.

103.    Given the short amount of time between service of process upon Omnia and the scheduled hearing, PainTEQ elected to proceed against Mr. Subasic only, without prejudice to a later hearing against Omnia. A copy of the amended notice of hearing reflecting PainTEQ's election is attached as Exhibit M.

104.    The day before the hearing on PainTEQ's motion for temporary injunction, Omnia provided PainTEQ with copies of ten May 1, 2020 letters sent to PainTEQ's former employees purporting to terminate Omnia's "Agent Agreement" with each employee. Copies of the letters are attached as Exhibit N, including the letters sent to Mr. Subasic and Ms. Walker.

105.    Notably, nine of the letters contain the self-serving representation that, according to Omnia, "Our records show that you have provided no information or sales for Omnia under the Agreement to date." But that representation is absent from the letter to former PainTEQ employee, Nicholas Freeman—suggesting that Mr.

---

[6] PainTEQ originally sued just Mr. Subasic, but filed an amended complaint once it began to learn about Omnia's misconduct.

Freeman had provided information and sales to Omnia in violation of his restrictive covenant agreement with PainTEQ.

106.    Following the hearing, the circuit court entered a temporary injunction against Mr. Subasic on June 18, 2020 and a permanent injunction on October 17, 2020. With the perceived encouragement by the Court, PainTEQ and Omnia engaged in discussions to explore resolving PainTEQ's claims absent further litigation.

107.    As those discussions continued, however, PainTEQ learned that so did Omnia's misconduct.

108.    Despite Omnia representing to PainTEQ with the May 1, 2020 letters that Omnia had terminated its relationship with Ms. Walker, she continues to perform services for Omnia in violation of her agreement with PainTEQ.

109.    For example, in September 2020, Ms. Walker arranged a meeting with one of PainTEQ's customers to attempt—by misusing the confidential and proprietary information she learned from PainTEQ, including confidential pricing information—to convince the customer to switch from PainTEQ to Omnia.

110.    Mr. Loerzel has similarly contacted customers in PainTEQ's program and—by misusing the confidential and proprietary information he learned from PainTEQ, including confidential pricing information—encouraged the physicians to switch from PainTEQ to Omnia. By misusing this information to undercut PainTEQ's pricing, Mr. Loerzel has convinced at least one PainTEQ physician to switch to Omnia.

111.    Mr. King has engaged in similar misconduct.

112.    In other words, despite their agreements with PainTEQ containing the restrictive covenants' prohibition against them doing so—and Omnia's knowledge of those agreements and covenants—the terminated PainTEQ employees, including Mr. King, Mr. Loerzel, Ms. Walker, and Mr. Subasic, have:

a.    improperly disclosed PainTEQ's confidential and proprietary information, including to Omnia and on Omnia's behalf;

b.    improperly used PainTEQ's confidential and proprietary information, including on Omnia's behalf;

c.    improperly competed with PainTEQ, including on Omnia's behalf;

d.    improperly solicited at least one current PainTEQ employee, including on Omnia's behalf; and

e.    improperly interfered with PainTEQ's business relationships, including by attempting to persuade physicians and customers to cease doing business with PainTEQ in favor of Omnia.

113.    PainTEQ also learned that Omnia's misconduct, directly and through the terminated PainTEQ employees Omnia has engaged, or other Omnia employees, independent contractors, distributors, or representatives, involved and involves making false, materially misleading, and defamatory statements about PainTEQ.

114.    These statements include that Omnia has patents that PainTEQ has infringed or is infringing upon.

115.    These statements have been made to third parties, including PainTEQ's current and prospective customers and physicians in PainTEQ's program.

116.    Omnia has made and is making these statements in an effort to unfairly compete with PainTEQ.

117.    As a result of the breaches of PainTEQ's agreements, misappropriation of PainTEQ's trade secrets, tortious interference with PainTEQ's business relationships, and the false, materially misleading, and defamatory statements, PainTEQ's business has suffered and continues to suffer.

118.    PainTEQ engaged the undersigned law firm to represent it in this action and is obligated to pay a reasonable fee for its services.

119.    All conditions precedent to maintaining this action have occurred, been performed, or have been waived.

**Count One**
**Violation of Florida's Uniform Trade Secrets Act**
**Misappropriation of Trade Secrets by Acquisition and Use against**
**Omnia**

120.    PainTEQ realleges and incorporates by reference paragraphs 1 through 119.

121.    This is an action against Omnia for misappropriation of trade secrets by acquisition and use under the Florida Uniform Trade Secrets Act, section 688.001, et seq., of the Florida Statutes.

122.    PainTEQ's trade secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by third parties, including competitors, who can obtain economic value from their acquisition or use.

123.    Omnia acquired, is acquiring, or is threatening to acquire, and used, is using, or is threatening to use, PainTEQ's trade secrets without express or implied consent.

124.    Omnia willfully and maliciously acquired, is acquiring, or is threatening to acquire, and used, is using, or is threatening to use, PainTEQ's trade secrets without express or implied consent.

125.    At the time of the acquisition and use, the source of the trade secrets — the terminated PainTEQ employees, including Mr. King, Mr. Loerzel, Ms. Walker, Mr. Subasic, Mr. Batton, and Mr. Wolfe, were bound by agreements containing restrictive covenants, including those attached as Exhibits A through E, and therefore Omnia knew or had reason to know that its knowledge of PainTEQ's trade secrets was acquired and used under circumstances giving rise to a duty to maintain their secrecy or limit their acquisition or use.

126.    Omnia knew or had reason to know that it acquired, is acquiring, or is threatening to acquire, and used, is using, or is threatening to use, PainTEQ's trade secrets through improper means.

127.    Omnia's acquisition and use of PainTEQ's trade secrets directly and proximately caused PainTEQ injury.

128.    There is no plain, speedy, or adequate remedy at law, and unless Omnia is enjoined from further misappropriating PainTEQ's trade secrets, PainTEQ will be irreparably injured.

129.   Omnia's acquisition and use of PainTEQ's trade secrets will directly and proximately cause PainTEQ injury.

130.   To the extent they can be calculated, PainTEQ has also suffered actual damages in the form of the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss.

131.   PainTEQ is entitled to an award of its attorneys' fees and costs under section 688.005 of the Florida Statutes.

WHEREFORE, PainTEQ demands the Court to:

A.     Order Omnia to return to PainTEQ any and all data, documents, information and other materials that constitute or comprise confidential and proprietary information, including PainTEQ's trade secrets, or property of PainTEQ;

B.     Enjoin Omnia from acquiring or using any and all data, documents, information and other materials that constitute or comprise PainTEQ's confidential and proprietary information, including PainTEQ's trade secrets;

C.     Enter judgment in favor of PainTEQ;

D.     Award PainTEQ damages in an amount to be determined at trial that exceeds $75,000.00, which includes:

i.      the actual loss caused by the misappropriation;

      ii.     the unjust enrichment caused by the misappropriation that is not taken into account in computing the actual loss;

      iii.     a reasonable royalty; and

      iv.     exemplary damages in an amount of twice the total of the actual loss, the unjust enrichment, and the reasonable royalty;

E.     Award PainTEQ its reasonable attorneys' fees and costs under section 688.005 of the Florida Statutes;

F.     Award PainTEQ interest;

G.     Award PainTEQ all further relief the Court finds just and proper.

### Count Two
### Tortious Interference with a Business Relationship against Omnia

132.    PainTEQ realleges and incorporates by reference paragraphs 1 through 119.

133.    This is an action against Omnia for tortious interference with a business relationship.

134.    PainTEQ has maintained business relationships with its current and prospective customers and referral sources.

135.    Omnia has had knowledge of PainTEQ's business relationships with its current and prospective customers and referral sources.

136.   Omnia has engaged in, is engaging in, or is threatening to engage in, intentional and unjustified interference with PainTEQ's business relationships with its current and prospective customers and referral sources.

137.   Omnia's breach of these relationships has directly and proximately caused PainTEQ injury. There is no plain, speedy, or adequate remedy at law, and unless Omnia is enjoined from further tortious interference with PainTEQ's business relationships, PainTEQ will be irreparably injured.

138.   To the extent they can be calculated, PainTEQ has also suffered actual damages, plus consequential and other damages flowing from Omnia's tortious interference with PainTEQ's business relationships in an amount to be determined at trial, plus interest and costs.

WHEREFORE, PainTEQ demands the Court to:

A.   Enjoin Omnia from engaging in any and all tortious interference with PainTEQ's business relationships with its current and prospective customers and referral sources;

B.   Enter judgment in favor of PainTEQ;

C.   Award PainTEQ damages in an amount to be determined at trial that exceeds $75,000.00, and which includes:

i.   compensatory damages; and

ii.   consequential damages, including lost profits; and

D.   Award PainTEQ all further relief the Court finds just and proper.

**Count Three**
**Tortious Interference with a Contractual Relationship against Omnia**

139.   PainTEQ realleges and incorporates by reference paragraphs 1 through 119.

140.   This is an action against Omnia for tortious interference with a contractual relationship.

141.   PainTEQ has maintained contractual relationships with its customers, referral sources, and its current and former employees, including Mr. King, Mr. Loerzel, Ms. Walker, Mr. Subasic, Mr. Batton, and Mr. Wolfe, who are bound by agreements containing restrictive covenants, including those attached as Exhibits A through E.

142.   Omnia has had knowledge of PainTEQ's contractual relationships with its customers, referral sources, and current and former employees.

143.   Omnia has engaged in, is engaging in, or is threatening to engage in, intentional and unjustified interference with PainTEQ's contractual relationships with its customers, referral sources, and current and former employees.

144.   Omnia's breach of these contractual relationships has directly and proximately caused PainTEQ injury. There is no plain, speedy, or adequate remedy at law, and unless Omnia is enjoined from further tortious interference with PainTEQ's contractual relationships, PainTEQ will be irreparably injured.

145.   To the extent they can be calculated, PainTEQ has also suffered actual damages, plus consequential and other damages flowing from Omnia's tortious interference with PainTEQ's contractual relationships in an amount to be determined at trial, plus interest and costs.

WHEREFORE, PainTEQ demands the Court to:

A.     Enjoin Omnia from engaging in any and all tortious interference with PainTEQ's contractual relationships with its customers, referral sources, and current and former employees;

B.     Enter judgment in favor of PainTEQ;

C.     Award PainTEQ damages in an amount to be determined at trial that exceeds $75,000.00, and which includes:

     i.     compensatory damages; and

     ii.     consequential damages, including lost profits;

D.     Award PainTEQ interest; and

E.     Award PainTEQ all further relief the Court finds just and proper.

**Count Four**
**Defamation against Omnia**

146.     PainTEQ realleges and incorporates by reference paragraphs 1 through 119.

147.     This is a claim against Omnia for defamation.

148.     Omnia published false statements about PainTEQ to a third party.

149.     Specifically, Omnia published statements about PainTEQ to a third party, asserting as fact that Omnia has patents that PainTEQ has infringed or is infringing upon.

150.     Omnia's statements are false and defamatory because they:

a.     Injure PainTEQ in its profession and business;

b.      Impeach PainTEQ's honesty, integrity, virtue, and reputation; and

c.      Injure PainTEQ's reputation and thereby expose PainTEQ to public hatred, contempt, ridicule, or financial injury.

151.    Omnia's statements constitute common law defamation per se because they injure PainTEQ in its profession and business.

152.    Omnia's defamatory statements require no proof of their injurious character because they obviously harm PainTEQ.

153.    Omnia's statements also constitute common law defamation per quod because his statements directly and proximately caused and continue to cause injury to PainTEQ, resulting in damages.

154.    Omnia published statements negligently, knowingly, or with reckless disregard for their falsity.

155.    Omnia's statements directly and proximately caused and continue to cause injury to PainTEQ, resulting in damages.

156.    Omnia's statements caused and continue to cause PainTEQ irreparable injuries for which there is no adequate legal remedy.

WHEREFORE, PainTEQ demands the Court to:

A.      Enter a temporary injunction:

i.      Enjoining Omnia from publishing any false statements that defame or disparage PainTEQ;

ii.     Requiring Omnia to correct any false statements it made that defame or disparage PainTEQ and to remove any such false statements

that have been anywhere on the internet, including websites, social media and messaging platforms, and blogs;

B.      Enter a permanent injunction, ordering Omnia as follows:

i.      Prohibiting Omnia from publishing any false statements that defame or disparage PainTEQ, including anywhere on the internet, including websites, social media and messaging platforms, and blogs;

ii.      Requiring Omnia to correct any false statements it made that defame or disparage PainTEQ and to remove any such false statements that have been anywhere on the internet, including websites, social media and messaging platforms, and blogs.

C.      Enter a declaratory judgment that Omnia's statements about PainTEQ are false and defamatory;

D.      Award PainTEQ actual damages in an amount to be determined at trial that exceeds $75,000.00;

E.      Award PainTEQ pre-judgment and post-judgment interest; and

F.      Award PainTEQ all further relief the Court finds just and proper.


Dated:          December 4, 2020


Respectfully submitted,

HILL, WARD & HENDERSON

/s/*Gregory P. Brown*
Gregory P. Brown
Florida Bar No. 98760

Ryan J. Leuthauser
Florida Bar No. 99517
Ryan M. Guerin
Florida Bar. No. 1011326
HILL WARD HENDERSON, P.A.
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602
Tel: (813) 221-3900; Fax: (813) 221-2900
Gregory.Brown@hwhlaw.com
Ann-Marie.Hallett@hwhlaw.com
Ryan.Leuthauser@hwhlaw.com
Debra.Whitworth@hwhlaw.com
Ryan.Guerin@hwhlaw.com
Erika.Vap@hwhlaw.com
*Attorneys for PainTEQ, LLC*