# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

PAINTEQ, LLC,

      Plaintiff,

v.                                    Case No. 8:20-cv-02805-VMC-AAS

OMNIA MEDICAL, LLC,

      Defendant.

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, PainTEQ, LLC, moves under Federal Rule of Civil Procedure 56 for summary judgment on Counts II-X of Omnia Medical, LLC's Counterclaim (Doc. 20) and Count VI of its Complaint (Doc. 1) filed in Case No. 8:22-cv-00145.

## I.    STATEMENT OF MATERIAL FACTS – DESIGN PATENTS

1.    PainTEQ filed U.S. Provisional Patent Application No. 62/910,913 ("913 Provisional") on October 4, 2019. (Ex. 1.) PainTEQ later filed U.S. Patent No. 11,154,402 ("LaNeve"), which claims priority to the 913 Provisional. (Ex. 2.)

2.    The 913 Provisional contains photographs of a final prototype of the PainTEQ Gen 2 LinQ surgical cannula. (Ex. 1 at 21–26, 29–32, 35–40). Those photographs were converted into USPTO-compliant patent drawings in PainTEQ's 402 Patent. (Ex. 2 at 5–12, 16–19, 22–23).

3.    The Gen 2 LinQ surgical cannula depicted in both the 913 Provisional and LaNeve is the cannula that Omnia accuses of infringing both design patents at issue in this action. (Ex. 3 at 5–7); (Ex. 4 at 17–19).

4.    Orthocision, Inc. filed U.S. Design Patent Application No. 29/718,879 (the "879 Design Application") on December 30, 2019. (Ex. 5).

5.    Orthocision filed two continuation design patent applications claiming priority to the 879 Design Application, which matured into U.S. Design Patent Nos. D905,232 ("D232 Patent") and D922,568 ("D568 Patent"). (Ex. 6); (Ex. 7).

6.    The scope of the sole claim of the D232 Patent is limited to "the precise proportions of the flat face in relation to the barrel," (2) "the circular shape and precise dimensions of the proximal end," and (3) "the specific dimensions of the cannula." (Ex. 8 at 19–32).

7.    The scope of the sole claim of the D568 Patent is limited to "the dimensions of the barrel . . . . The remainder of the features are functional and outside the scope of the patent." (Ex. 9 at 44).

8.    U.S. Patent No. 10,219,841 ("Compton") issued on March 5, 2019, and is prior art to the D232 and D568 Patents under 35 U.S.C. § 102(a)(1). (Ex. 10).

9.    U.S. Patent No. 8,636,772 ("Schmierer") issued on January 28, 2014, and is prior art to the D232 Patent under 35 U.S.C. § 102(a)(1). (Ex. 11 at 4:39–42, FIG. 4).

10.    PainTEQ has never sold the accused cannula. (Ex. 12 at 100:13–16).

## II.    DESIGN PATENTS

### A. The D232 and D568 Patents are invalid and not infringed.

#### 1. *Background.*

PainTEQ    independently    developed    an    innovative    set    of    surgical

instruments—commercially known as LinQ—for performing SI joint fusion procedures. On **October 4, 2019**, PainTEQ filed the 913 Provisional, which included photographs of the final prototypes of LinQ surgical tools, including the surgical cannula. *See* (Ex. 1, FIGS. 4–10, 15–18, 21, 22, 24–30). Subsequently, PainTEQ filed the patent application for LaNeve, which converted these photographs into USPTO-compliant patent drawings. (Ex. 2, FIGS. 4–13, 19–22, 25–26). The table below contains a comparison of the LinQ surgical cannula design in the 913 Provisional and LaNeve.



| **The 913 Provisional** | **LaNeve** |
|---|---|
| FIG. 5 (partial view) | FIG. 5 (partial view) |

Orthocision developed its own surgical cannula design ("*patented design*"), which it first disclosed to the USPTO on **December 30, 2019,** in the 879 Design Application. (Ex. 5 at 1, FIGS. 1–40). Orthocision later filed two continuation design patent applications claiming priority to the 879 Design Application, which ultimately issued as the D232 and D568 Patents. (Ex. 6); (Ex. 7). Omnia licensed these patents from Orthocision and then accused PainTEQ's Gen 2 LinQ surgical cannula design of infringing them.

### 2. Omnia's patent infringement claims fail because the accused design is prior art against the D232 and D568 Patents.

#### a) The legal standard.

For Omnia to prevail on its design patent infringement claim, the Court must find that the asserted patents are valid *and* infringed. 35 U.S.C. § 282(b)(1)-(2). But when the accused product is disclosed in the prior art, validity and infringement are mutually exclusive. *Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir. 2009); *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1312 (Fed. Cir. 2001). "In simpler terms, if [the accused product] predates [the] allegedly infringed patent, then [the accused product] did not infringe." *ZT IP, LLC v. VMware, Inc.*, 2023 WL 1785769, at *2 (N.D. Tex. Feb. 6, 2023); *see also WPEM, LLC v. SOTI Inc.*, 837 F. App'x 773, 773–74 (Fed. Cir. 2020) (affirming a district court's holding that "infringement claims 'were frivolous in light of the fact that the Accused Technology is in fact prior art.'")

#### b) LaNeve depicts the accused surgical cannula design.

On October 4, 2019, PainTEQ filed the 913 Provisional, which contained photographs of both 3D printed and metal prototypes of its LinQ surgical cannula. In LaNeve, these photographs were directly converted into USPTO-compliant formal patent drawings, without any changes to the depicted design. Ultimately, PainTEQ implemented this design in its Gen 2 LinQ surgical cannula, which Omnia accuses of infringing the D232 and D568 Patents.

The table below compares the accused Gen 2 LinQ surgical cannula, the photographs filed with the 913 Provisional, and the drawings filed in LaNeve to

show that all three are identical:

| The Accused Surgical Cannula | The 913 Provisional | LaNeve |
|---|---|---|
|  | <br>FIG. 5 (partial view) | <br>FIG. 5 (partial view) |
|  | <br>FIG. 29 | <br>FIG. 6 |



### c) *The priority date of LaNeve is October 4, 2019.*

Under 35 U.S.C. § 102(d)(2), the subject matter disclosed in an issued patent claiming priority to an earlier patent application qualifies as prior art "as of the filing date of the earliest such application that describes the subject matter." To be entitled to the priority date of a provisional patent application, "a reference patent document need only meet the 'ministerial requirements" of § 120, "and the provisional . . . to which the reference patent document claims a right of priority must 'describe[ ] the subject matter' relied upon in the reference patent document as prior art." *Penumbra, Inc. v. Rapidpulse, Inc*., IPR2021-01466, 2023 WL 2605070, at *14 (PTAB Mar. 10, 2023) (precedential).

Here, all three "ministerial requirements" of § 120 are satisfied: (1) LaNeve and the 913 Provisional name the same joint inventors—Sean LaNeve, Charles Girsch, and Chris Girsch, (2) LaNeve was filed on April 17, 2020, while the 913 Provisional was actively pending, and (3) LaNeve contains a specific reference to the 913 Provisional. *See* 35 U.S.C. § 120; *see also* (Ex. 2 at 1); (Ex. 1 at 1). Next, with respect to the "subject matter" requirement of § 102(d)(2), the table provided above demonstrates that LaNeve and the 913 Provisional depict the same exact surgical cannula design. LaNeve's surgical cannula design is thus entitled to the benefit of the filing date of the 913 Provisional, which is **October 4, 2019**.

### d) *The priority date of the D232 and D568 Patents is December 30, 2019.*

As other judges in this district have recognized, "[e]ntitlement to a parent application's filing date presents a question of law." *See, e.g*., *Spencer v. Taco Bell*

*Corp.*, 2013 WL 5499609, at *2 (M.D. Fla. Oct. 2, 2013), aff'd, 560 F. App'x 997
(Fed. Cir. 2014) (citing *In re Owens*, 710 F.3d 1362, 1366 (Fed. Cir. 2013)). "[I]f a
design patentee relies on a parent application to achieve an earlier effective filing
date, the written description requirement is applied by looking to the parent's
drawings (and the text describing the drawings), even if the parent application is
for a utility patent." *Id.* (invalidating the asserted design patent on summary
judgment for being anticipated by prior art because "[t]he differences between the
drawings of the [prior] application and the [asserted] patent [we]re fatal" to the
priority claim).

The D232 Patent was filed on **June 11, 2020**, the D568 Patent was filed on
**October 27, 2020**, and both claim the following priority chain: (1) each of the
D232 and D568 Patents is a continuation of the 879 Design Application, filed on
**December 30, 2019**; and (2) the 879 Design Application is a continuation-in-
part (CIP) of the U.S. Utility Application No. 14/668,976 filed on March 25, 2015,
which issued as U.S. Patent No. 10,993,757 ("757 Patent"). (Ex. 6 at 1); (Ex. 7 at 1).
The surgical cannula design claimed in the D232 and D568 Patents is wholly
absent from the 125 Figures of the 757 Patent, and therefore the D232 and D568
Patents are not entitled to claim benefit of priority to its filing date. (Ex. 13, FIGS.
1–125). Thus, the earliest possible priority date of the D232 and D568 Patents is
the filing date of the 879 Design Application, which is **December 30, 2019**. (Ex.
5 at 1).

### e) The accused surgical cannula design is prior art against the D232 and D568 Patents.

Sections A.3.b.-c., *supra*, establish that LaNeve, which was effectively filed on **October 4, 2019**, depicts the accused surgical cannula design. Next, Section A.3.d., *supra*, established that the earliest effective filing date of the D232 and D568 Patents is **December 30, 2019**. Accordingly, under 35 U.S.C. § 102(a)(2), the accused design depicted in LaNeve is *prima facie* prior art against the D232 and D568 Patents, and therefore Omnia's infringement claims are precluded as a matter of law. *See, e.g., WPEM*, 837 F. App'x at 773–74 (affirming a district court's holding that "infringement claims 'were frivolous in light of the fact that the Accused Technology is in fact prior art.'").

### 3. Omnia's infringement allegations render the D232 and D568 Patents invalid for being anticipated by LaNeve.

In addition to being frivolous, the infringement allegations by Omnia effectively invalidate the D232 and D568 Patents for being anticipated by LaNeve.[1] Under Federal Circuit case law, Omnia's infringement allegations satisfy PainTEQ's burden of proving that LaNeve's surgical cannula design anticipates the asserted patents. Under the governing case law, Omnia's statements that the accused design "*directly infringes*" the D232 and D568 Patents constitute a binding admission that LaNeve, which (according to Omnia) depicts the accused

---

[1] PainTEQ denies infringement, but for the purposes of its summary judgment motion, pleads anticipation in the alternative. *See, e.g.*, *Vanmoor*, 201 F. 3d 1363, 1366 (Fed. Cir. 2000) ("Wal–Mart and the manufacturers denied that the accused cartridges infringe but have, 'by conceding infringement for purposes of the summary judgment motion and [their] on sale defense, properly pled in the alternative.'") (quoting *Evans Cooling*, 125 F.3d at 1451) (citing Fed. R. Civ. P. 8(e)).

design, *anticipates* these patents. *See* (Ex. 14 at 31–32); (Ex. 15 at 32–33); *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997) ("[F]or purposes of the summary judgment motion, this burden [to prove invalidity] is met by [patentee's] allegation . . . that the [accused product] infringes."). In sum, if the Court accepts that the accused and patented designs are similar enough to find infringement, it must invalidate the D232 and D568 Patents as anticipated by LaNeve under 35 U.S.C. § 102(a)(2).

### 4. The D232 and D568 Patents are invalid for being primarily functional.

"Design patents on . . . *primarily* functional rather than ornamental designs are invalid." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015) (emphasis added). Although functionality is a question of fact, the Federal Circuit will affirm summary judgment where there are no issues of material fact. *See Golden Eye Media USA, Inc. v. Evo Lifestyle Prod. Ltd.*, 2022 WL 2232517, at *2 (Fed. Cir. June 22, 2022). The Federal Circuit "review[s] [a] district court's finding that the patented designs are dictated by their function for clear error." *Ethicon Endo-Surgery, Inc.*, 796 F.3d at 1328; *see also Golden Eye*, 2022 WL 2232517, at *2.

The functionality doctrine "preclude[s] design-patent protection for something that, though purported to be an 'ornamental' design, is really dictated by function." *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 80 F.4th 1363, 1380 (Fed. Cir. 2023) (citing *Ethicon*, 796 F.3d at 1328–30). "[W]hether a design is primarily functional or primarily ornamental requires

viewing the claimed design 'in its entirety.'" *Ethicon*, 796 F.3d at 1329 (Fed. Cir. 2015). Therefore, "the determination of whether [a] patented design is dictated by the function of the article of manufacture must ultimately rest on an analysis of its *overall* appearance." *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455 (Fed. Cir. 1997) (emphasis added).

Finally, "[p]atentability of a design **cannot be predicated on size or utility**." MPEP § 1504.02 (quoting *In re Zonenstein*, 172 F.2d 599, 600 (CCPA 1949)) (emphasis added). That is because "the size and dimensions of the [claimed design] . . . are not protectable features." *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1186 (S.D. Cal. 2021), *aff'd sub nom. Golden Eye Media USA, Inc. v. Evo Lifestyle Prod. Ltd.*, 2022 WL 2232517, at *1 (Fed. Cir. June 22, 2022).

### a) The D232 and D568 Patents are primarily functional.

There are no issues of material fact about which elements of the patented design are functional and which elements are ornamental because the Court conclusively resolved these issues in its claim construction orders. (Ex. 8 at 23–29); (Ex. 9 at 42–47). So the issue of whether the D232 and D568 Patents are invalid because they claim a primarily functional surgical cannula design is ripe for resolution on summary judgment.

To determine whether a patented design is invalid as primarily functional, courts consider the following factors: whether (1) "the protected design represents the best design," (2) "alternative designs would adversely affect the utility of the

specific article," (3) "there are any concomitant utility patents," (4) "the advertising touts particular features of the design as having specific utility," and (5) "there are any elements in the design or an overall appearance clearly not dictated by function." *PHG Techs., LLC v. St. John Companies, Inc.*, 469 F.3d 1361, 1367 (Fed. Cir. 2006). In its claim construction orders, the Court considered these *PHG* factors and concluded that the elements of the patented design identified in the annotated figure below are purely functional. (Ex. 8 at 24); (Ex. 9 at 43).



"[The guidance slot within the barrel [is] dictated by [its] functionality." Omnia I, Doc. 88 at 26.

"The proximal end is thus functional." *Id.* at 29.

"[T]he general shape of the barrel is dictated by functionality ..." *Id.* at 27.

"[T]he flat face itself is purely functional ..." *Id.* at 32.

"[T]he smooth outer surface . . . [is] dictated by [its] functionality." *Id.* at 26.

"[T]he shape and size of the tangs are . . . dictated by function, rather than ornamentation." *Id.* at 28.

"[The] contour of the barrel . . . [is] dictated by [its] functionality." *Id.* at 26.

"The bluntness of the tangs is thus a function, rather than ornamental, feature." *Id.* at 27-28.

FIG. 2

Ultimately, for the D568 Patent, "[t]he Court conclude[d] that the **dimensions** of the barrel of the cannula are ornamental features. *The remainder of the features are functional and outside the scope of the patent*." (Ex. 9 at 44) (emphasis added). Therefore, the Court's claim construction order compels the Court to invalidate the D568 Patent for claiming a primarily functional surgical cannula. *See In re Zonenstein*, 172 F.2d 599, 600 (CCPA 1949) ("Patentability of a design cannot be predicated on size or utility.").

Next, for the D232 Patent, the Court held that "circular shape . . . of the proximal end" is the sole design element whose appearance is not predicated on dimensions or function. (Ex. 8 at 30). But this *single* element, by itself, does not rescue the D232 Patent from invalidity because "when examining whether the patent is invalid as functional courts look to the entire design as opposed to . . . one or two features in isolation." *Golden Eye*, 525 F. Supp. 3d at 1181 (citing *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993)). It is clearly evident from the image provided above that the "*overall appearance*" of the surgical cannula claimed in the D232 Patent is dictated by functional rather than aesthetic considerations. *See Berry Sterling*, 122 F.3d at 1455 ("[T]he determination of whether [a] patented design is dictated by the function of the article of manufacture must ultimately rest on an analysis of its *overall* appearance.").

To satisfy its burden of proving that the D232 and D568 Patents are invalid, PainTEQ must show that the claimed designs are *primarily*—not purely—

functional. The Court's claim construction orders confirm that PainTEQ has met
this burden. Thus, the Court should hold the D232 and D568 Patents invalid
because the surgical cannula design they claim is primarily functional.

### 5. The D568 Patent is indefinite.

 "A lack of definiteness renders invalid the patent or any claim in suit."
*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 902 (2014) (citing 35
U.S.C. § 112, ¶ 2(3)) (internal quotation omitted). "[A] design patent is indefinite
under § 112 if one skilled in the art, viewing the design as would an ordinary
observer, would not understand the scope of the design with reasonable certainty
based on the claim and visual disclosure." *In re Maatita*, 900 F.3d 1369, 1377 (Fed.
Cir. 2018). In a design patent, "[a] visual disclosure may be inadequate—and its
associated claim indefinite—if it includes multiple, internally inconsistent
drawings." *Id.* at 1375 (citing *Times Three Clothier, LLC v. Spanx, Inc*., 2014 WL
1688130, at *7–9 (S.D.N.Y. 2014) (holding a design patent invalid for
indefiniteness because the side views were inconsistent with the back view)).
"Indefiniteness is a question of law . . . ." *Horizon Pharma, Inc. v. Dr. Reddy's
Lab'ys Inc.*, 839 F. App'x 500, 504 (Fed. Cir. 2021) (affirming a district court's
summary judgment of invalidity based on indefiniteness).

### a) Figures 5 and 7 require the front and back faces to be straight, while Figures 1-4, 6, 9, and 10 disclaim the front and back faces entirely.

In its claim construction order, the Court "defer[red] ruling on PainTEQ's
indefiniteness arguments," noting that district courts generally resolve the issue of

indefiniteness at summary judgment. (Ex. 9 at 29, 32). Thus, PainTEQ now reintroduces—and expands—its indefiniteness argument presented at claim construction. Specifically, in the D568 Patent, Figures 5 and 7 provide the side views of the claimed surgical cannula design. These figures use *solid* lines to claim the ***straight*** front and back faces of the cannula, without any protruding structures or surface features.



Fig. 5

The scope of the claim is limited solely to a surgical cannulas with ***straight*** front and back faces.

Based on these figures, a surgical cannula that does not have straight front and back faces would not infringe the D568 Patent. For example, a surgical cannula depicted in Figure 28 of U.S. Pat. No. 11,083,511 Patent ("'511 Patent") has protruding pin guide slots (139) positioned on the barrel of the cannula, giving it a rocket-shaped profile. (Ex. 16, FIG. 28). Based on Figures 5 and 7, this rocket-shaped cannula would not infringe the D568 Patent.



An exemplary cannula with non-straight faces would not infringe the D568 Patent, based on the claim limitations imposed in Figures 5 and 7— i.e., faces of the barrel claimed with straight solid lines.

FIG. 28

In direct conflict with Figures 5 and 7, the D568 Patent's Figures 1–4, 6, 9, and 10 depict the front and back faces of the barrel with *dashed* lines, thus expressly disclaiming their straight appearance from the scope of the patent. *See* (Ex. 9 at 36) ("When viewed at an angle, like in figure 3, the broken lines clearly disclaim the flat face").

**Fig. 2**                                                    **Fig. 3**

The scope of the claim is agnostic with respect to the appearance of the front and back faces because they are disclaimed with dashed lines.

Accordingly, when the D568 Patent is analyzed through the lens of Figures 1–4, 6, 9, and 10, the patent scope is *not limited* to cannulas with straight front and back surfaces. Indeed, because the front and back faces are disclaimed entirely, a cannula with non-straight faces—for example the rocket-shaped cannula depicted in Figure 28 of the 511 Patent—*would* fall within the scope of the D568 Patent. This irreconcilable inconsistency between the scope of the claim in Figures 5 and 7 versus Figures 1–4, 6, 9, and 10 fails to inform a person skill of the art whether the D568 Patent can only be infringed by a cannula with straight front and back faces or whether the D568 Patent also encompasses cannula designs with irregularly shaped barrels. *See Times Three Clothier* 2014 WL 1688130 at *8 (invalidating a design patent when "[r]esolving [an] inconsistency in favor of the design depicted by the . . . back view, as opposed to the design depicted by the side views, would materially alter the 'subject matter . . . covered by the exclusive rights of the patent'") (quoting *Ancor Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 737 (Fed. Cir. 2014) (holding that to satisfy Section 112, a patent claim must be "sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent")). Accordingly, because Figures 5 and 7 have contradictory claim scope with respect to Figures 1–4, 6, 9, and 10, the D568 Patent is indefinite.

### b) Figures 5 and 7 conflict with Figures 1–4, 6, 9, and 10 with respect to the dimensions of the barrel.

Additionally, in its claim construction order, "the Court conclude[d] that the

*dimensions of the barrel* of the cannula are ornamental features" while "[t]he remainder of the features are functional and outside the scope of the patent." (Ex. 9 at 44) (emphasis added). Thus, the precise relative dimensions of the barrel are *critical* to the scope of the claim of the D568 Patent. However, the irreconcilable conflict between the solid lines in Figures 5 and 7 and dashed lines in Figures 1-4, 6, 9, and 10 renders these dimensions ambiguous.

Specifically, because Figures 5 and 7 depict the front and back faces with the solid lines, these figures define the precise distance between the front and back faces, in relation to other design elements. But Figures 1–4, 6, 9, and 10 directly contradict this limitation by expressly disclaiming the distance between the front and back faces of the barrel. This inconsistency renders the scope of the D568 Patent indefinite with respect to the *sole* non-purely-functional element of the claimed design.

**Fig. 5**



Figure 5 claims the specific distance between the front and back faces of the barrel relative to other features of the cannula.

Figure 9 expressly disclaims the distance between the front and back faces of the barrel relative to other features of the cannula.

Fig. 9

For the reasons set forth above, the Court should invalidate the D568 Patent as indefinite under 35 U.S.C. § 112, ¶ 2.

### 6. PainTEQ's surgical cannula design does not infringe the D232 and D568 Patents.

To prove infringement of a design patent, "[t]he patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010) (citing *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 681 (Fed. Cir. 2008) (*en banc*)). "In *Egyptian Goddess*, the Federal Circuit described a two-stage analysis for infringement." *Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*, 2019 WL 1304290, at *15 (M.D. Fla. Mar. 21, 2019), *aff'd sub nom. Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337 (Fed. Cir. 2020).

At the first stage of the infringement analysis, the court must determine whether "the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar.'" *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015). "Where the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,' the patentee fails to meet its burden of proving infringement as a matter of law." *Id.* (citing *Egyptian Goddess*, 543 at 678). If during the first stage "the district court [finds] the nonfunctional, ornamental aspects of the claimed and accused designs to be plainly dissimilar," it does not need to proceed to the second stage of the analysis, "as resolution of the infringement inquiry [is] already clear." *Ethicon*, 796 F.3d at 1337.

At the second stage of the ordinary observer test, "the court must conduct a three-way analysis comparing the accused product, the patented design, and the prior art." *ABC Corp. v. P'ship & Unincorporated Associations Identified on Schedule "A,"* 52 F.4th 934, 942 (Fed. Cir. 2022) (citing *Egyptian Goddess*, 543 F.3d at 678). "[T]he district court correctly grant[s] summary judgment of noninfringement" when "[t]he district court's detailed analysis [is] supportive of its conclusion that an ordinary observer, taking into account the prior art, would not believe that the accused . . . product was the same as the patented design." *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1345 (Fed. Cir. 2020).

### a) The patented and accused designs are plainly dissimilar.

When evaluating infringement of a design patent, it is axiomatic that "a design patent is *not a substitute for a utility patent*." *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1189 (Fed. Cir. 1988) (emphasis added). Thus, "[a] device that copies the utilitarian or functional features of a patented design is *not an infringement unless the ornamental aspects are also copied*, such that the overall 'resemblance is such as to deceive.'" *Id.* (quoting *Gorham*, 81 U.S. at 528) (emphasis added). "[T]he 'ordinary observer' analysis is not limited to the ornamental features of a subset of the drawings, but instead must encompass the claimed ornamental features of all figures of a design patent." *Contessa Food Prod., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1379 (Fed. Cir. 2002), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008).

Here, the Court expressly held that the following elements of the patented design are purely functional: "the general shape of the barrel"; "the smooth outer surface and contours of the barrel"; "the flat face on the barrel"; "the guidance slot within the barrel"; "the shape and size of the tangs"; "the bluntness of the tangs"; and "the stopping mechanism on the [proximal end of] the cannula." (Ex. 8 at 26–32); (Ex. 9 at 44–47). The Court held that these elements are "outside the scope of the patent," and therefore Omnia cannot rely on the similarities stemming solely from these features as the basis of its infringement case. (Ex. 8 at 25); (Ex. 9 at 44); *see also Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1344–45 (Fed. Cir. 2020) ("[F]eatures that are purely functional . . . are not themselves entitled to patent protection.").

### (1)    The D232 Patent is not infringed because the accused design does not have flat faces and the dimensions of the proximal end and the barrel are markedly different.

The Court's claim construction order constrained the scope of the D232 Patent to the following three elements: (1) "the *precise proportions of the flat face in relation to the barrel*," (2) "the circular shape and *precise dimensions* of the proximal end," and (3) "the *specific dimensions* of the cannula." Omnia I, Doc. 88 at 19–32) (emphasis added). None of these elements is present in the accused design. First, the dominant visual features of the D232 Patent are the front and back flat faces of the barrel. In the accused design, there are no flat faces—instead, the entire barrel is perfectly cylindrical. Second, the proximal end of the accused

design is strikingly smaller than the prominently oversized collar of the D232 Patent. Both of these differences are illustrated below.



**D232 Patent**

**Accused Design**

The flat faces on the front and back of the barrel and the prominently oversized proximal end dominate the design claimed in the D232 Patent.

In direct contrast to the D232 Patent, the barrel of the accused cannula is perfectly cylindrical its proximal end is markedly smaller.

Next, to accurately compare the precise relative dimensions and proportions of the accused and patented designs, the drawings of the D232 Patent are superimposed over corresponding views of the accused cannula. To facilitate clarity, internal shading lines in the design patent drawings have been removed and the solid lines are emphasized in red. The scale of the accused design has been set such that the outer diameters of the barrels in the accused and patented designs have the same dimensions, and that same scale has been maintained across all overlays.

These drawings clearly illustrate that in the D232 Patent, the proximal end is much wider and thicker than the proximal end of the accused design.

Additionally, in the D232 Patent, the length of the barrel in relation to its thickness is markedly greater than the corresponding proportions in the accused design.

**Front view**:



The cannula claimed in the D232 and D568 Patents is markedly longer than the accused cannula in relation to the width of the barrel.

The thickness and diameter of the proximal end in the D232 Patent are strikingly larger than the corresponding dimensions in PainTEQ's design.

**Top view**:



In the D232 Patent, the outer diameter of the proximal end is markedly larger than the outer diameter of the stop collar in the accused design.

### (2)   *The D568 Patent is not infringed because the barrel in the accused design has different dimensions.*

Under the Court's claim construction order, the scope of the D568 Patent is even more limited than the scope of the D232 Patent—indeed, the Court constrained the scope of the D568 Patent solely to the dimensions of the barrel. (Ex. 9 at 44) ("[T]he Court concludes that the dimensions of the barrel of the

cannula are ornamental features. The remainder of the features are functional and
outside the scope of the patent."). Because the dimensions of the barrel in the D232
and D568 Patents are the same, the analysis in the preceding section also applies
to the D568 Patent, establishing the plain dissimilarity between the patented and
the accused designs.

### (3)    *There are many more dissimilarities between the accused and patented designs.*

As established in Sections A.7.1-2., the plain dissimilarities with respect to
the flat faces, oversized proximal end, and precise dimensions of the cannula
preclude infringement. What's more, there are many other substantially distinct
and plainly dissimilar elements between the accused and patented designs that
conclusively prove non-infringement under the first stage of the ordinary observer
test. To that end, the Federal Circuit affirms summary judgment of non-
infringement when the district court identifies even a small number of differences
in the patented and accused designs. *See*, *e.g.*, *Wallace v. Ideavillage Products
Corp.*, 640 Fed. Appx. 970, 972 (Fed. Cir. 2016) (affirming summary judgment of
non-infringement when "[w]ith respect to the first stage, the district court
highlighted six differences between the [accused] design and the claimed design");
*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015)
(finding "no error with the district court's determination that the claimed and
accused designs are plainly dissimilar" based on the enumerated differences in the
shapes, width, length, and taper of three components of a medical device);

*Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 933 (Fed. Cir. 2014) ("[T]wo differences are sufficient to affirm the court's [non-infringement] holding . . . .").

Some of the plain dissimilarities between the patented and the claimed designs are listed below and illustrated in the annotated visual comparisons that follow the verbal descriptions:

- PainTEQ's cannula has a distinctive notch on the front distal end, which is not present in the D232 and D568 Patents;

- The D232 and D568 Patents require the guidance slot to be aligned with the left tang (i.e., 9 o'clock position in the top view depicted in FIG. 8), whereas in PainTEQ's cannula, the guidance slot is positioned on the front of the cannula (i.e., 6 o'clock position in the top view);

- The D232 and D568 Patents require that the guidance slot must terminate within the barrel, whereas in PainTEQ's design, the guidance slot extends along the entire length of the inside surface of the barrel and does not have a termination point therein;

- The D232 and D568 Patents require that, when viewed from the side, the tangs must have uniform widths and terminate in semicircular tips, whereas in PainTEQ's design, the tangs have non-uniform, tapered profiles with angular tips;

- The D232 and D568 Patents require that the sacral contour must have a curved yoke that gradually merges with the outer surfaces of the barrel, whereas the sacral contour in PainTEQ's design is markedly more abrupt and forms a straight edge at the interface with the barrel;

- The iliac contour in PainTEQ's design has a profoundly greater curvature radius and extends farther along the barrel than the iliac contour claimed in the D232 and D568 Patents;

- PainTEQ's federally registered logo and word mark are prominently displayed on the curved front face of the cannula, whereas the D232 Patent claims a flat face without any adornment;

- The D232 Patent claims prominent trapezoid-shaped elements on the front and the back of the cannula at the interface of the tangs and the barrel, while PainTEQ's cannula does not have such trapezoidal elements.

The dissimilarities between the patented and the accused designs are clearly apparent in the side-by-side comparisons presented below.



**Front view**:

D232 Patent: flat face without surface adornment

Accused design: PainTEQ's trademarks are prominently displayed on the curved front face of the cannula

D232 Patent: a trapezoidal element where the tangs merge into the barrel

Accused design: a rounded arc with a distinctive, prominent notch

D232 and D568 Patents: straight tangs with rounded tips

Accused design: tapered tangs with angular tips

**Back view**:



**D232 and D568 Patent**: the sacral contour merges with the barrel via a rounded yoke

**Accused design**: the sacral contour merges with the barrel at a straight edge

**Side view**:



**D232 and D568 Patents**: the iliac contour is shallow and extends only slightly farther than the sacral contour

**Accused design**: the iliac contour has a high radius of curvature and extends significantly farther than the sacral contour

**D232 and D568 Patents**: the tangs have a uniform width and rounded tips

**Accused design**: tangs are tapered with angular tips

**D232 and D568 Patents**: the sacral contour is smooth and gradual

**Accused design**: the sacral contour is abrupt and shallow

**Top view**:

<div style="border:1px solid red">

<u>D232 and D568 Patenta</u>: the guidance slot is aligned with the left tang (i.e.,
9 o'clock position in the top view)

<u>Accused design</u>: the guidance slot is positioned on the front interior surface
of the cannula (i.e., 6 o'clock position in the top view).

</div>



**Top isometric view:**

<div style="border:1px solid red">

<u>D232 and D568 Patents</u>: the guidance slot has a
semicircular termination point within the barrel

<u>Accused design</u>: the guidance slot runs the entire
length of the barrel and does not have a
termination point therein

</div>



The analysis provided above proves that the accused and patented designs
are sufficiently distinct and plainly dissimilar. Accordingly, as a matter of law, the

accused design does not infringe the D232 and D568 Patents under the first stage of the ordinary observer test.

### b) When viewed in the context of the prior art, an ordinary observer would not be deceived that the accused design is the same as the patented design.

In addition to infringement of the D232 Patent being precluded under first stage of the ordinary observer test, *see Ethicon*, 796 F.3d at 1337, Omnia's infringement claim also fails under the second stage of this test. Under the second stage, "the district court [is] required to conduct the ordinary observer analysis through the lens of the prior art." *ABC Corp.*, 52 F.4th at 942. "The shared dominant feature from the prior art will be no more than a background feature of the design, necessary for a finding of substantial similarity but insufficient by itself to support a finding of substantial similarity." *Id.*

### (1) The accused design is the same as the prior art design depicted in LaNeve.

The analysis provided in Section A.3.b., *supra*, establishes that the accused design is the same as the prior art design depicted in LaNeve. Accordingly, an ordinary observer familiar with the prior art would attribute the appearance of the accused design to LaNeve rather than being "deceived into believing that the accused product is the same as the patented design." *See Richardson*, 597 F.3d at 1295. Therefore, infringement is precluded under the second stage of the test.

### (2) The accused design is "nearly identical" to a third-party prior art design

Additionally, Orthocision—the original patentee of the asserted patents—

conceded to the USPTO that the accused design has "contours and arms that **closely resemble** the features of Compton," while Orthocision's expert testified that "Compton . . . discloses a cannula having arms and contours that are **nearly identical** to those of the cannula disclosed and illustrated in [LaNeve]."[2] (Ex. 17 at 5); (Ex. 18, ¶ 106) (emphasis added); *see also* (Ex. 10[3], FIG. 3). Therefore, according to Orthocision and its expert, an ordinary observer would attribute the accused design to Compton rather than being "deceived into believing that the accused product is the same as the patented design." *See Richardson*, 597 F.3d at 1295. The table below provides a side-by-side comparison between the accused design, the prior art design depicted Compton, and the patented design. The degree of aesthetic similarity between the accused design and Compton versus the patented design speaks for itself.

| Accused design | Prior art (Compton) | D232 Patent | D568 Patent |
|---|---|---|---|
|  |  |  |  |

[2] Orthocision made these statements with respect to the cannula depicted in PainTEQ's U.S. Patent No. 11,020,129, which is the same cannula Omnia accused here.
[3] Compton issued on March 5, 2019 and therefore it is prior art against the D232 and D568 Patents under 35 U.S.C. § 102(a)(1).

Lastly, with respect to "the circular shape and precise dimensions of the
proximal end" claimed in the D232 Patent, the accused design much more closely
resembles the prior art design depicted in Schmierer[4] than the patented design, as
clearly demonstrated in the side-by-side comparison provided below. (Ex. 11 at
4:39–42, FIG. 4). Therefore, an ordinary observer would attribute this element of
the accused design to the prior art rather than being "deceived into believing that
the accused product is the same as the patented design." *See Richardson*, 597 F.3d
at 1295.

| Accused design | Schmeirer (Prior Art) | D232 Patent |
|---|---|---|
|  | | |

For all the reasons set forth above, the Court should grant PainTEQ's motion
for summary judgment of non-infringement of the D232 and D568 Patents.

---

[4] Schmierer issued on January 28, 2014 and therefore is prior art against the D232 Patent under
35 U.S.C. § 102(a)(1).

**B. Omnia is legally precluded from seeking PainTEQ's profits under
35 U.S.C. § 289 because PainTEQ has never sold the accused
cannula**

"Section 289 of the Patent Act provides a damages remedy specific to design
patent infringement." *Samsung Elecs. Co. v. Apple Inc.*, 580 U.S. 53, 55 (2016).
"Section 289 allows a patent holder to recover the *total profit* an infringer makes
from the infringement." *Id.* at 58 (emphasis added). But Section 289 is limited to
instances where the infringer manufactures the infringing article "for the purpose
of sale" or "sells or exposes for sale any [such] article." 35 U.S.C. § 289. Indeed,
Section 289 "permit[s] recovery of an infringer's profits only in cases where the
infringement involved sale of a product embodying the patented design." *Trans-
World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1567 (Fed. Cir. 1984)
(holding Section 289 did not apply where infringing display racks were loaned, but
not sold, to stores for use in selling eyeglasses.)

### 1. PainTEQ has never sold the accused cannula.

In Count 2 of its *Omnia I* Counterclaim and Count 6 of its *Omnia II*
Complaint in, Omnia seeks design patent infringement damages for "unjust
enrichment." (Ex. 14 at 33); (Ex. 15 at 34). Omnia is not entitled to profit-based
damages for the alleged design patent infringement under Section 289—or any
other statute—because PainTEQ has *never sold* the accused product. *See Trans-
World* 750 F.2d at 1567 ("Section 289 does not cover that use of the patented
design by [the infringer], since that use does not involve the application of the
patented design to the glasses 'for the purpose of sale' or the 'sale' of an article of

manufacture 'to which such design ... has been applied.'"). Instead, analogously to the defendant in *Trans-World*, PainTEQ supplies LinQ surgical instruments—including the accused cannula—to doctors without charge and retains ownership of these instruments, which are returned to PainTEQ after the surgery. PainTEQ makes its profit from the *performance* of the surgical procedures—not from the *sale* of the surgical instruments. Therefore, PainTEQ is entitled to summary judgment precluding Omnia from seeking PainTEQ's profits generated by its LinQ SI joint fusion procedure as a remedy for the alleged design patent infringement.

## III.    STATEMENT OF MATERIAL FACTS – REMAINING CLAIMS

1.    Orthocision was issued U.S. Copyright Registration No. VA 2-209-321 ("321 Registration") for a three-page work describing surgical steps. (Ex. 19).

2.    The 321 Registration lists as authors: Troy Schifano, who created text; Steve Anderson, who created 2-D artwork and text; and Adam Young, who created 2-D artwork. (Ex. 19).

3.    Orthocision was issued U.S. Copyright Registration No. VA 2-212-904 ("904 Registration") for a computer drawing of an implant. (Ex. 20). The 904 Registration lists as the sole author Adam Young who created the 2-D artwork. (Ex. 20).

4.    On June 30, 2020 Troy Schifano and Steve Anderson assigned certain rights in the 321 Registration to Orthocision, and on June 26, 2020 Adam Young assigned certain rights in the 321 and 904 Registrations to Orthocision. (Ex. 21).

5.      On October 2, 2020, Orthocision entered into a license agreement with
Omnia regarding the 321 and 904 Registrations and other "Intellectual Property"
rights, as defined therein ("License Agreement"). (Ex. 22).

6.      Orthocision does not have the right to sue for infringement prior to June 26,
2020, because during negotiations with Orthocision Adam Young and his company
West Coast Surgical specifically bargained to retain that right by excluding it from
the scope of the rights conveyed to Orthocision. (Ex. 23).

7.      Omnia has not received revenue from selling or licensing the 321 or 904
Registrations. (Ex. 24 at ¶146); (Ex. 25 at 106:4-7).

8.      Omnia accused PainTEQ's Gen 1 Surgical Technique Guide ("Gen 1 STG") of
infringing the 321 Registration. (Ex. 26).

9.      Omnia accused a product poster of infringing the 904 Registration. (Ex. 27).

10.     March 14, 2020 was the last dissemination of the PainTEQ Gen 1 STG
accused of infringing the 321 Registration. (Ex. 28).

11.     There is no record evidence establishing a fair market value for the
copyrighted works.

12.     There is no record evidence establishing a causal connection between the
alleged trademark and copyright infringement and PainTEQ's revenue from
performing the LinQ SI joint fusion procedure.

13.     On November 25, 2014, Orthocision was issued U.S. Trademark
Registration Nos. 4,646,387 ("387 Registration") and 4,646,388 ("388
Registration") for the wordmark PsiF and stylized PsiF logo, respectively, which

are registered for "[m]edical apparatus and instruments for use in orthopedic surgery". (Ex. 29); (Ex. 30).

14.     The October 2, 2020 License Agreement included a revocable license for Omnia to use the 387 and 388 Registrations. (Ex. 22).

15.     On January 17, 2023, Orthocision assigned the 387 and 388 Registrations to Omnia. (Ex. 31).

16.     Count V and Count VI of Omnia's counterclaims are limited to alleged violations of the 387 and 388 Registrations. (Ex. 14 at 39-44, ¶¶ 70–105); (Ex. 32, Rog. 11).

17.     Omnia accuses PainTEQ's LinQ Gen 1 STG of infringing the 387 and 388 Registrations. (Ex. 14 at 40, ¶ 79); (Ex. 14 at 42, ¶ 97).

18.     February 24, 2020, was the last dissemination of a PainTEQ Gen 1 STG accused of infringing the 387 and 388 Registrations. (Ex. 33).

19.     On April 1, 2017, Omnia and PainTEQ entered into a Stocking Agreement. (Ex. 34).

20.     The Stocking Agreement was terminated February 19, 2019. (Ex. 35).

21.     Omnia alleges PainTEQ breached the Stocking Agreement by "continuing to use literature, marketing information, and other confidential or proprietary information in a manner inconsistent with the Stocking Agreement". (Ex. 14 at 45).

22.     Omnia answered an interrogatory by listing of all of the ways PainTEQ allegedly misused confidential information in violation of the Stocking Agreement. (Ex. 36, Rog. 19).

23. The Stocking Agreement's confidentiality provision applies only to "confidential or proprietary information furnished by . . . OMNIA to PAINTEQ or any of its affiliates during the term of this Agreement". (Ex. 34 at 4).

24. The Stocking Agreement states that the confidentiality provision "shall not apply to information which . . . at the time of disclosure is, or thereafter lawfully becomes, part of the public domain . . . ." (Ex. 34 at 4).

25. On March 26, 2015, Orthocision filed the application for U.S. Patent No. 10,426,539 ("539 Patent"), and on September 10, 2015 this application was published by the United States Patent and Trademark Office ("USPTO"). (Ex. 37).

26. The 539 Patent discloses "[a]n improved method of fusing the sacroiliac joint and tools for accomplishing the same." (Ex. 37 at 2).

27. The 539 Patent discloses the PsiF method and tools. (Ex. 14 at 24); (Ex. 38 at 99:20–100:2).

28. The PsiF tools and PsiF surgical technique guide were publicly disclosed and distributed before PainTEQ and Omnia entered into the Stocking Agreement. (Ex. 39 at 59:12–61:9, 64:9–65:25); (Ex. 38 at 80:23–81:6, 143:3-144:3); (Ex. 40); (Ex. 41 at 36:8–36:15; 37:11–37:21).

29. The PsiF surgical technique guide is not considered confidential information. (Ex. 38 at 143:3–144:3).

30. Before the Stocking Agreement was signed, Omnia provided to PainTEQ a copy of the PsiF Surgical Technique Guide, color photographs of the instruments,

CAD images of the instruments, post-operative imaging of the implant, and an image and detailed description (including dimensions) of the implant. (Ex. 40).

31.    Before the Stocking Agreement was signed, Omnia and PainTEQ trained physicians on the PsiF procedure and Omnia provided the physical instruments to PainTEQ to evaluate. (Ex. 41 at 36:8–15; 37:11–21); (Ex. 45); (Ex. 46).

32.    In the years prior to execution of the Stocking Agreement, the PsiF procedure had been marketed to and performed by countless medical professionals, and its implant had been implanted in scores of patients, who had no obligation of confidentiality, whether by a signed confidentiality or nondisclosure agreement or otherwise. (Ex. 39 at 45:17–23, 64:9–65:25).

33.    Omnia has not identified any damages attributable to PainTEQ's alleged breach of the Stocking Agreement's section 10 confidentiality clause. (Ex. 32, Rog. 17); (Ex. 42); (Ex. 38 at 285:13-16).

34.    Omnia's cause of action for breach of contract does not state a claim for breach of the Non-Circumvention clause in Section 14 of the Stocking Agreement. (Ex. 14 at 45, ¶ 111).

## IV.    COPYRIGHT CLAIMS

### A. Background

In Counts III and IV of its Counterclaim, Omnia seeks actual damages and disgorgement of PainTEQ's profits for alleged infringement of 321 and 904 Registrations (collectively, "Copyrights"). (Ex. 14 at 36, 38). The 321 Registration (Ex. 19) covers a three-page marketing brochure describing surgical steps, while

the 904 Registration (Ex. 20) covers a computer drawing of an implant. Omnia licensed the Copyrights on October 2, 2020 (Ex. 22) and then accused PainTEQ's LinQ Gen 1 Surgical Technique Guide ("Gen 1 STG") (Ex. 26) of infringing the 321 Registration and accused PainTEQ of making and displaying a poster ("accused poster") (Ex. 27) that allegedly infringes the 904 Registration.

The record shows that the last time PainTEQ used the accused Gen 1 STG was in an email sent on March 14, 2020. (Ex. 28). On that date, PainTEQ ceased all use of the Gen 1 STG and transitioned to its new LinQ Gen 2 Surgical Technique Guide, which does not incorporate any images or text from the 321 Registration. *Compare* (Ex. 43) *with* (Ex. 19). And, with respect to the accused poster, the record lacks any evidence of who made it, when it was created, or when it was first displayed.

### B. Omnia lacks statutory standing.

Section 501(b) of the Copyright Act dictates that "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right ***committed while he or she is the owner of it***." 17 U.S.C. § 501(b) (emphasis added); *see also John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 405 (2d Cir. 2018) ("[S]ection 501(b) prevents even holders of one of the six exclusive section 106 rights from suing unless the alleged infringement occurred 'while he or she [was] the owner of it.'"). Because all alleged copyright infringement occurred *prior* to Omnia licensing the 321 and 904

Registrations, Section 501(b) precludes Omnia from pursuing its copyright infringement claims as a matter of law.

### C. Omnia is not entitled to monetary damages for the alleged copyright infringement.

As a threshold issue, Omnia was not damaged by the alleged copyright infringement because PainTEQ stopped using the accused Gen 1 STG and all other material under the Copyrights prior to Omnia having any exclusive rights in the Copyrights. Omnia's rights in the Copyrights are derived solely from the License Agreement between Orthocision and Omnia. (Ex. 22). Under Section 2.1 of the License Agreement, Orthocision granted to Omnia a "limited, revocable" exclusive license in the Copyrights and other "Intellectual Property." Under Section 2.2, no rights were granted to Omnia "[e]xcept as expressly provided in [the] Agreement . . . ." Section 6.1(a) states that "Licensor *shall provide* Licensee with the sole right, but not the obligation, to Prosecute Intellectual Property applications and issued Intellectual Property, in Licensee's sole discretion." (emphasis added). No other provision of the License Agreement addresses the right to sue for infringement.

The Licensing Agreement did not grant Omnia a right to sue for past infringement—only a promise that Orthocision "*shall* provide" that right at some point in the future, which did not occur prior to Omnia filing its Counterclaim. (Ex. 22 at section 6.1(a)); *see Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1157 (Fed. Cir. 2021) (holding that an IP assignment agreement containing the operative language "*shall*" is "at most, a statement of *a future intention* to assign . . . ,

[but] [i]t did not effectuate a present automatic assignment of title . . .") (emphasis added). Since Section 2.2 of the License Agreement expressly reserves to Orthocision all rights not expressly granted to Omnia, as a matter of law, the License Agreement did not confer on Omnia the right to sue for past infringement.

Lastly, Orthocision could not have granted Omnia the right to sue for copyright infringement that predated June 26, 2020 because the original authors and co-owners of the copyrighted works did not grant Orthocision such right. (Ex. 21).[5] For these reasons, as a matter of law Omnia cannot recover any damages for the alleged copyright infringement.

### D. Actual Damages

#### 1.    *No lost sales or licensing revenue.*

The Middle District's seminal case on copyright infringement damages is *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008). In *Thornton*, the court held that "lost sales, lost opportunities to license, or diminution in the value of the copyright" are available remedies only where the plaintiff earns revenue *directly* from the copyrighted work itself. *Thornton*, 580 F. Supp. at 1276 (quoting *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001)).

In his expert report, Mr. Rogers conceded that "Omnia has not licensed the Copyrights," and at his deposition, Mr. Rogers testified that "[he's] not aware of

---

[5] Orthocision negotiated with Adam Young and his employer West Coast Surgical for the right to sue for past infringement, but West Coast Surgical refused to grant this right. (Ex. 23).

any revenue associated with the Surgical Technique Guide." (Ex. 24 at ¶146); (Ex. 25 at 106:4-7). Therefore, it is undisputed that Omnia has never earned any revenue from the Copyrights, and therefore it is not entitled to any actual damages in the form of "lost sales, lost opportunities to license, or diminution in the value of the copyright" because there are none. *See Thornton*, 580 F. Supp. at 1276.

### 2.  *Omnia is not entitled to a "reasonable royalty" because it failed to demonstrate that the Copyrights have a fair market value.*

In *Thornton*, the court recognized that if a copyright owner does not earn revenue from the copyright, its actual damages are limited to a "retroactive licensing fee." *Id.* (citing *Montgomery v. Noga*, 168 F.3d 1282, 1295-96 (11th Cir. 1999)). However, "[i]n order to demonstrate entitlement to a reasonable license fee, Plaintiff 'must show that the thing taken had a fair market value.'" *Id.* (quoting *On Davis*, 246 F.3d at 166). This burden is met when: "(1) the plaintiff demonstrates that [it] previously received compensation for use of the infringed work; or (2) the plaintiff produces evidence of benchmark licenses, that is, what licensors have paid for use of similar work." *Id.* (citing *On Davis*, 246 F.3d at 166).

As established above, for the first prong of the *Thornton* test, Omnia has received *zero* revenue from the Copyrights. Next, for the second prong, Omnia failed to produce any evidence of benchmark copyright licenses. Instead, Mr. Rogers based his entire analysis on two license agreements, both of which involved copyrights in addition to **utility patents** and another eleven licensing agreements that involved *only* **utility patents**, without any copyrights. (Ex. 24

at ¶151). Furthermore, for the two agreements that did involve copyrights, the copyright was not directed to a brochure describing surgical steps or an image of an implant. (Ex. 24 at Exhibit N.1, licenses 11029 and 22621). Therefore, Omnia failed to provide any benchmark copyright licenses demonstrating what a surgical device company would have paid to license these copyrighted works.

Because Omnia did not provide any evidence demonstrating that the Copyrights had a fair market value, it is not entitled to recover a retroactive licensing fee. *See Thornton*, 580 F. Supp. at 1276 (granting summary judgment because "Plaintiff has never licensed the [copyrighted work] for fees" and "fail[ed] to produce any evidence of benchmark licenses").

### 3. Omnia failed to demonstrate a causal relationship between the alleged copyright infringement and PainTEQ's profits.

"In a claim for profits, 'the plaintiff must show a **causal relationship** between the infringement and profits....'" *Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846, 863 (11th Cir. 2021) (quoting *Pronman v. Styles*, 676 F. App'x 846, 848 (11th Cir. 2017)) (emphasis added). "[A] plaintiff may not seek gross revenues based entirely on a speculative connection to the plaintiff's claim." *Id.* (affirming summary judgment where the plaintiff failed to show that the defendant's revenue was affected by use of the infringing images) (quoting *Thornton*, 580 F. Supp. at 1280). Indeed, "gross revenue under the statute means gross revenue reasonably related to the infringement, not unrelated revenues." *Thornton*, 580 F. Supp. at 1280 (quoting *On Davis*, 246 F.3d at 160). "[A] court

should find in favor of an infringer in cases where 'despite the existence of a conceivable link, the plaintiff failed to offer anything more than mere speculation as to the existence of a causal connection between the infringement and the claimed revenues[.]'" *Ordonez-Dawes v. Turnkey Properties, Inc.*, 2008 WL 828124, at *4 (S.D. Fla. Mar. 27, 2008) (quoting *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 524 (4th Cir. 2003)).

### a) The profit period used in Omnia's calculations extends far beyond the alleged infringement.

As established above, the record shows that the last time PainTEQ disseminated the accused Gen 1 STG was March 14, 2020, and there is no evidence of PainTEQ ever creating or displaying the accused poster, much less after that date. Nevertheless, Mr. Rogers "assumed" that the relevant infringement period was "from beginning of 2019 through the most recent financial data, 3rd quarter 2023." (Ex. 24 at ¶¶164-166). This period is overly expansive and is based on pure speculation rather than evidence of PainTEQ's actual use of the accused Gen 1 STG or the accused poster. Therefore, there is no causal relationship between PainTEQ's revenue earned over a 4-year span that Mr. Rogers used in his calculations and the time period during which the alleged copyright infringement occurred. *See Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 798-800 (8th Cir. 2003) (holding that a nexus existed for the infringer's profit generated "only by the sale of the [advertised product], and only during the time that the

[infringing] commercial aired," but any profits beyond that were "not sufficiently tie[d] [to] the infringing use").

### b) *Omnia's infringement calculations are improperly based on pure speculation rather than facts.*

During his deposition, Mr. Rogers was asked point-blank: "How do you connect the sales that you just descried with the use of the copyrighted material?" (Ex. 25 at 95:8-11). Mr. Rogers answered: "I told you that the **assumption** is that the copyrighted material led to the sales of the product, *however that might have happened*." *Id.* at 95:14-16 (emphasis added). Next, Mr. Rogers was asked: "Tell me all of the facts upon which that assumption is based." *Id.* at 95:19-20. Mr. Rogers's answer speaks for itself: "*I don't have any particular facts*. My job is to identify the sales that are **potentially** at issue." *Id.* at 95:22-24 (emphasis added).

Clearly, Mr. Rogers's conclusory disgorgement-of-profits theory is based on pure speculation devoid of any factual evidence of a causal relationship between PainTEQ's use of the accused Gen 1 STG and poster and PainTEQ's profit generated from SI joint surgeries. Therefore, the Court must enter summary judgment in PainTEQ's favor on the issue of disgorgement of profits for the alleged copyright infringement. *See, e.g., Latimer v. Roaring Toyz, Inc.*, 2010 WL 3747148, at *5 (M.D. Fla. Sept. 21, 2010) (granting summary judgment where "[the plaintiff] has not produced sufficient non-speculative evidence of any link between

Kawasaki's alleged infringement (the use of five of [plaintiff's] photos in their

media kit) and the profits generated from the sale of the [depicted] motorcycle).

## V.    TRADEMARK CLAIMS

In addition to accusing PainTEQ's LinQ Gen 1 STG of copyright

infringement, Omnia also accused PainTEQ of trademark infringement based on

the word "PsiF" appearing on the last page of this three-page brochure, which is

otherwise prominently branded with PainTEQ and LinQ trademarks. Specifically,

in Counts V and VI of its Counterclaim, Omnia seeks actual damages and

disgorgement of PainTEQ's profits for alleged infringement of the 387 and 388

Registrations (collectively, "Trademark Registrations") for the wordmark PsiF and

stylized PsiF logo, respectively, which are registered for "[m]edical apparatus and

instruments for use in orthopedic surgery". (Ex. 14 at 39, 41); (Ex. 29); (Ex. 30).

According to electronic records in the USPTO assignment database, on January 17,

2023, Orthocision assigned the Trademark Registrations to Omnia. (Ex. 31). Thus,

when Omnia filed its Counterclaim, the only right it had in the Trademark

Registrations was the limited and revocable use right granted to Omnia by

Orthocision in the License Agreement.

As the sole basis for its Lanham Act claims, Omnia alleges that, without

authorization, PainTEQ used the PsiF trademark in certain versions of the Gen 1

STG, one of which was attached to Omnia's counterclaim. (Ex. 26). The accused

Gen 1 STG includes three pages of step-by-step instructions for performing the

nine-step Gen 1 LinQ posterior sacroiliac joint fusion surgical procedure. The term

"PsiF" appears only twice, both times in the ninth paragraph at the bottom of the last page, without any special font, color, stylization, or emphasis. (Ex. 26). These two instances occurred due to an editorial oversight. (Ex. 41 at 75:17-23; 82:24 – 83:6).

The Gen 1 STG was distributed through email to its intended recipients. The target recipients had already met or contacted PainTEQ personnel, and the email was a form of follow-up for PainTEQ. Each email included half a dozen or more attachments, the Gen 1 STG being among them. The last instance in which PainTEQ emailed the Gen 1 STG containing the "PsiF" wording was on February 24, 2020.[6] (Ex. 33).

### A. Omnia lacks statutory standing to sue for infringement of the Registrations.

Omnia's Lanham Act claims fail as a matter of law because the alleged infringing conduct permanently ceased at least by February 24, 2020—long before January 17, 2023, which is when Omnia acquired ownership rights and the right to enforce the Trademark Registrations or any related unregistered rights.

### 1. Omnia lacks standing under § 1114(1)

As a legal threshold matter, the Lanham Act dictates that *only* the registrant can recover for infringement of a registered trademark. 15 U.S.C. § 1114(1); 15 U.S.C. § 1127; *see also Roor Int'l BV v. Good Timez III, LLC*, 2019 WL 4933657, at *2 (M.D. Fla. Oct. 7, 2019). When Omnia filed its Counterclaim on December 18,

---

[6] The Gen 1 STGs emailed after this date did not contain the term "PsiF."

2020, it was Orthocision—not Omnia—that was the registrant and the sole owner of the Trademark Registrations. (Doc. 20-12; Doc. 20–13). Omnia merely had a revocable licensee to use the registered marks, without any property interest and without any ownership rights. (Ex. 22 at sections 2.1-2.2). Thus, Omnia lacked statutory standing to assert infringement of the Trademark Registrations when the Counterclaim was filed. *See*, *e.g.*, *Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 Fed. Appx. 803 ("Under [15 U.S.C. § 1114(1)], a claimant must own the mark outright to have statutory standing. Mere exclusive licensees lack standing to bring these claims.") (internal quotations and parentheticals omitted).

The January 17, 2023 assignment of the Trademark Registrations did not cure Omnia's lack of standing because this assignment *postdated* Omnia's Counterclaim. *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 777–80 (Fed. Cir.), *amended on reh'g in part*, 104 F.3d 1296 (Fed. Cir. 1996) (reversing a district court's denial of a motion to dismiss for lack of standing where "[the plaintiff] has failed . . . to establish that an assignment, in writing, of the Intellectual Property took place before the lawsuit was filed."). Furthermore, a trademark owner lacks standing and cannot obtain recovery if the infringing acts ceased before it acquired ownership of the asserted trademark registration. *Neutron Depot,* 798 Fed. Appx. at 806–07 (affirming dismissal of registration-based Lanham Act claims and denying recovery where the plaintiff acquired ownership of the asserted mark more than two years after the alleged infringement ceased, and explaining that the plaintiff "did not own the mark at any point when

the infringement took place."). Since Omnia did not own the Trademark Registrations when it filed its Counterclaim and further because PainTEQ's allegedly infringing conduct ceased nearly three years prior to Omnia's acquisition of ownership, Omnia is not entitled to registration-based recovery under the Lanham Act.

### 2. *Omnia lacks standing under § 1125(a)*

Omnia does not have, and has not pled, a claim for a violation of unregistered rights under 15 U.S.C. § 1125(a). Counts V and VI are counts for infringement of the Trademark Registrations, and they allege harm to the goodwill of the Trademark Registrations. (Ex. 14 at 40, ¶ 83); (Ex. 14 at 43, ¶ 101). These counts do not allege rights in or violations of any unregistered marks, common law rights, trade dress, or any other unregistered source indicia. That Omnia did not plead any such claim is demonstrated clearly by its Interrogatory No. 11. There, PainTEQ asked Omnia to identify all trademark rights asserted against PainTEQ, whether registered or unregistered. (Ex. 32, Rog. 11). Omnia identified only the two Trademark Registrations—it did not identify any common law marks, any other unregistered rights, or any source indicia. (Ex. 32, Rog. 11). Omnia signed its answer on July 22, 2021, more than two-and-a-half years ago, Omnia never supplemented it, and fact discovery was completed based on that response being complete and accurate. (Ex. 32, Rog. 11). Omnia's trademark infringement claims are therefore based entirely on the Trademark Registrations.

Regardless, at the time the Counterclaim was filed, Omnia lacked standing to allege a violation under 15 U.S.C. § 1125(a). The Supreme Court dictates that "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Here, Omnia was not directly injured by the alleged infringement because the accused conduct ceased prior to Orthocision and Omnia entering the License Agreement. Thus, the only entity that could have been injured by the alleged infringement was Orthocision, but it did not expressly grant to Omnia the right to sue for past infringement in the License Agreement. Instead, Section 6.1(a) – the only provision addressing the right to sue – states that Licensor "***shall provide***" Licensee with enforcement rights. (Ex. 22). As discussed above, under *Omni MedSci, Inc. v. Apple Inc.*, this language is merely a statement of future intention, and it is not a present transfer of rights. 7 F.4th at 1157. Since Omnia did not acquire the right to sue for past infringement until January 17, 2023, when Orthocision assigned the Trademark Registrations and the associated goodwill to Omnia (more than two years after the Counterclaim was filed), Omnia did not have statutory standing to bring an action under §1125(a). *See Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 709 (11th Cir. 2019) (affirming a district court's ruling that the exclusive trademark licensee "lack[ed]

contractual authority, and hence standing, to pursue § 1125(a) violations against infringers in its own capacity").

### B. Omnia is not entitled to monetary damages for the alleged trademark infringement.

The Court should enter judgment against Omnia on its Lanham Act claims because the record is devoid of evidence that the alleged infringing conduct caused any harm to Omnia or resulted in any profit for PainTEQ. The remedies for violations of 15 U.S.C. § 1114 and 1125(a) flow through 15 U.S.C. § 1117(a). This statute provides for monetary recovery of the defendant's profits and any actual damages sustained by the plaintiff. But "[t]o establish entitlement to monetary relief, a plaintiff must show *actual confusion*." *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1563 (Fed. Cir. 1994) (citing *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 n. 5, 15 USPQ2d 1053, 1055 n. 5 (8th Cir. 1990)) (emphasis added); *see also Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 2006 WL 1663357, at *8 (N.D. Ga. June 14, 2006), *aff'd*, 496 F.3d 1231 (11th Cir. 2007).

To prove actual confusion, Omnia would have to present specific evidence that (1) the recipient of an email containing the Gen 1 STG with the "PsiF" wording was the purchasing decision-maker at the recipient's hospital, surgical center, or other organization—i.e., a prospective customer, (2) the recipient of the email opened the attached Gen 1 STG, which was only one of many attachments, (3) the recipient read to the bottom of the last page to even encounter the term "PsiF", and (4) as a result, the recipient confused PainTEQ for Omnia despite the fact that Gen

1 STG was prominently branded with the PainTEQ and LinQ trademarks. The record contains none of this evidence. Thus, all of Omnia's theories for monetary damages due to PainTEQ's inadvertent inclusion of the word "PsiF" on the last page of the Gen 1 STG are built on layer upon layer of inferences in Omnia's favor, which is pure speculation and conjecture. However, "[a] mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So.2d 1015, 1018 (Fla. 1984)). Therefore, because there is no evidence of actual consumer confusion, Omnia's claims for monetary damages based on the alleged trademark infringement are precluded as a matter of law.

### 1. *Actual Damages.*

To recover actual damages, Omnia must show "economic or reputational injury flowing directly from the" alleged infringement. *Lexmark*, 572 U.S. at 133; *see also Optimum*, 496 F.3d at 1252 (affirming summary judgment dismissing trademark infringement and unfair competition claims because plaintiff "introduced no evidence of the actual monetary damages that it suffered from [defendant's] alleged trademark infringements and unfair competition on the company's website.").

To prove actual damages, Omnia must introduce evidence showing a reasonable basis that the wording "PsiF"—which is buried in the text in the last

paragraph on the last page of PainTEQ's Gen 1 STG—was a substantial factor in

harming Omnia. Again, "[a] mere possibility of such causation is not enough."

*Guinn*, 602 F.3d at 1256. Because Omnia had zero rights to the Trademark

Registrations when the alleged infringement happened, there is no evidence in the

record of economic or reputational injury to Omnia, and therefore its Lanham Act

claims fail.

Furthermore, there is no evidence in the record that Omnia ever lost any

sales due to PainTEQ's use of the Gen 1 STG with the wording "PsiF." To make this

showing, Omnia would have to advance evidence that, in addition to confusing

PainTEQ for Omnia solely because the word "PsiF" was included in the text of the

Gen 1 STG, the recipient of the Gen 1 STG or its organization then became a

PainTEQ customer specifically because of this confusion. There is zero evidence in

the record that this far-fetched scenario has ever happened.

Lastly, the lack of actual damages is clearly apparent in the expert report of

Mr. Rogers and his deposition testimony, where Mr. Rogers expressly stated that

he *assumed* liability without making any inquiry into the causal basis as to whether

the Gen 1 STG with the PsiF wording on its last page *actually* harmed Omnia. (Ex.

24 at ¶¶ 102, 124); (Ex. 25 at 63:22-64:6, 64:24-65:6); *see Optimum Techs., Inc.*,

496 F.3d at 1252 (finding "no evidence of the actual monetary damages that

[plaintiff] suffered from [defendant's] alleged trademark infringements and unfair

competition on the company's website."). Accordingly, Omnia is not entitled to any

actual damages, whether by lost profits, by a reasonable royalty, or otherwise.

## 2. *Disgorgement of Profits.*

As the threshold issue, disgorgement of profits under the Lanham Act requires a causal relationship between the alleged infringement and the defendant's profits. *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *14 (N.D. Ala. Nov. 16, 2016) ("[A] plaintiff is not entitled to disgorgement until the plaintiff has proved causation."); *see also Optimum*, 2005 WL 3307508, at *3. For the reasons explained above, Omnia has not made this showing. There is simply no evidence that any of PainTEQ's profits from **SI joint surgeries** are attributable to the word "PsiF" appearing within the last paragraph of the Gen 1 STG. Instead, Omnia once again improperly relies on layers upon layers of inferences to establish causation. *See, e.g.*, *Guinn*, 602 F.3d at 1256. Accordingly, Omnia's claim for disgorgement under the Lanham Act fails on this ground as well.

## 3. *Omnia's infringement calculations are improperly based on pure speculation rather than facts.*

Finally, as set forth above under the copyright claims, Omnia's expert testimony is based purely on speculation, and it is devoid of evidentiary value.

## VI.   OMNIA'S UNFAIR COMPETITION CLAIMS FAIL AS A MATTER OF LAW

Omnia asserts various unfair competition claims under Ohio law and, alternatively, Florida law, predicated on PainTEQ's infringement of (1) the 539 Patent; (2) the D232 Patent; (3) the '321 Registration; (4) the '904 Registration; (5) the '387 Registration; and (6) the '388 Registration; as well as the statements that: (7) PainTEQ is not infringing, and has not infringed, the intellectual property rights of Omnia Medical; and (8) Omnia Medical is infringing, and has infringed,

the intellectual property rights of PainTEQ. (Ex. 14 at 46, ¶¶ 115–16, 118); (Ex. 14 at 48, ¶ 127); (Ex. 14 at 49, ¶¶ 130-131). All of these unfair competition claims fail because they are based on failed copyright, trademark, and patent claims or are otherwise preempted. *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1347 (Fed. Cir. 2020) ("the [statutory and common law] unfair competition claims fail because they are based entirely on [plaintiff's] infringement claims.").

### A. Patent claims

Omnia claims PainTEQ unfairly competes with Omnia Medical by infringing the 539 and D232 Patents. (Ex. 14 at 46, ¶¶ 115–16); (Ex. 14 at 48, ¶ 127); (Ex. 14 at 49, ¶ 130). State law unfair competition claims based on federal patent infringement are preempted. *Tropical Paradise Resorts, LLC v. JBSHBM, LLC*, 2018 WL 4932282, at *5 (S.D. Fla. Oct. 10, 2018) (because the "state law counterclaims necessitate a determination of patent law issues" they "are preempted"), *aff'd sub nom. Tropical Paradise Resorts, LLC v. Point Conversions, LLC*, 806 F. App'x 966 (11th Cir. 2020) ("we affirm the district court's conclusion that . . . claims arising under Florida's Deceptive and Unfair Trade Practices Act are preempted by federal patent law."). Because Omnia's claims for unfair competition are based on infringement of the 539 and D232 Patents, they are preempted and PainTEQ is entitled to summary judgment as a matter of law. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964) ("Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law,

such as that forbidding unfair competition, give protection of a kind that clashes
with the objectives of the federal patent laws.").

### B. Copyright claims

"The [Copyright] Act establishes a comprehensive set of rights and remedies
to protect copyrights, and preempts most state actions so that the rights and
remedies will be consistent for all copyright holders." *Foley v. Luster*, 249 F.3d
1281, 1286 (11th Cir. 2001). Omnia's unfair competition claims are each based on
the allegation that PainTEQ unfairly competes with Omnia Medical by infringing
the '321 and '904 Registrations. (Ex. 14 at 46, ¶¶ 115–16); (Ex. 14 at 48, ¶ 127); (Ex.
14 at 49, ¶ 130). When "[t]he only deceptive or unfair practices alleged . . . are the
improper copying and distribution of [a] copyrighted work," the claim is
preempted by the Copyright Act. *Millennium Travel & Promotions, Inc. v. Classic
Promotions & Premiums, Inc.*, 2008 WL 2275555, at *3 (M.D. Fla. June 2, 2008);
*see also Hua-Cheng Pan v. Kohl's Dep't Stores, Inc.*, 2013 WL 5181144, at *8 (S.D.
Ohio Sept. 12, 2013) (holding that unfair competition claims under the Ohio
Deceptive Trade Practices Act and Ohio common law based on copyright
infringement are preempted). Since Omnia's claims of unfair competition are each
predicated on PainTEQ's alleged infringement of the 321 and 904 Registrations,
those claims are preempted and PainTEQ is entitled to summary judgment as a
matter of law. *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1494
(11th Cir. 1990) ("A claim for unfair competition based upon allegations of copying,
and in the absence of proof of any element of unfair competition other than

copying, is clearly pre-empted by the Act.").

## C. Trademark claims

Omnia alleges that PainTEQ unfairly competes with Omnia Medical by infringing the 387 and 388 Registrations. (Ex. 14 at 46, ¶¶ 115–16); (Ex. 14 at 48, ¶ 127); (Ex. 14 at 49, ¶ 130). Omnia's claim that PainTEQ infringes these registrations fails for the reasons stated above and for the reasons stated in PainTEQ's motion to dismiss for lack of standing. (Ex. 44 at 6–9). When a claim of unfair competition is based on a failed federal trademark infringement claim, the unfair competition claim equally fails. *See Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008) ("[the plaintiff's] claim for a violation of the Florida Deceptive and Unfair Trade Practices Act rises or falls on the success of its trademark infringement . . . claims"); *see also Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008) (affirming summary judgment in favor of defendants on FDUTPA and common law unfair competition claims based on a failed federal trademark infringement claim); *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 653 (11th Cir. 2007) (granting summary judgment in favor of defendants where plaintiff's unfair competition claim was predicated on plaintiff's failed Lanham Act claim). Because Omnia's claims for infringement of the '387 and '388 Registrations fail, so too must its dependent state and common law unfair completion claims, and PainTEQ is entitled to summary judgment as a matter of law.

**D. Alleged statements about infringement**

Omnia alleges that PainTEQ unfairly competes with Omnia Medical by making two allegedly false statements: (1) "that PainTEQ is not infringing, and has not infringed, the intellectual property rights of Omnia Medical;" and (2) "that Omnia Medical is infringing, and has infringed, the intellectual property rights of PainTEQ." (Ex. 14 at 46, ¶ 118); (Ex. 14 at 48, ¶ 127); (Ex. 14 at 49, ¶ 131). Because there is no evidence that PainTEQ has made either of those statements, PainTEQ is entitled to summary judgment.

**VII.  BREACH OF CONTRACT**

Omnia alleges in Count 7 that PainTEQ breached the Stocking Agreement by "continuing to use literature, marketing information, and other confidential or proprietary information in a manner inconsistent with the Stocking Agreement". (Ex. 14 at 45). During discovery, Omnia answered an interrogatory with a list of all of the ways PainTEQ allegedly misused confidential information. (Ex. 36). That information falls into three general categories: information about how the PsiF surgical procedure is performed, information about the instruments necessary to perform the PsiF procedure, and information contained in the PsiF Surgical Technique Guide, which is a marketing brochure that contains a high-level summary of the PsiF procedure and instruments. PainTEQ is entitled to summary judgment on this claim for two independent reasons.

First, the Stocking Agreement's confidentiality provision applies only to "confidential or proprietary information furnished by . . . OMNIA to PAINTEQ or

any of its affiliates during the term of this Agreement" (*i.e.* on or after April 1, 2017).

(Ex. 34 at 4). The Agreement also states explicitly that the confidentiality provision

"shall not apply to information which . . . at the time of disclosure is, or thereafter

lawfully becomes, part of the public domain . . . . or [] was otherwise in the receiving

party's lawful possession prior to disclosure as shown by its written records" (*Id.*)

None of the three categories of information referenced above falls within this

narrow definition of "Confidential Information" for multiple reasons.

- Omnia alleges in its counterclaim that PsiF is "designed to practice the

method of at least one claim of the 539 Patent." (Ex. 14 at 24). The 539 Patent, in

turn, discloses "[a]n improved method of fusing the sacroiliac joint and tools for

accomplishing the same." (Ex. 37 at 2). Prior to issuing the 539 Patent, the USPTO

necessarily determined that it "contain[ed] a written description of the invention,

and of the manner and process of making and using it, in such full, clear, concise,

and exact terms as to enable any person skilled in the art to which it pertains, or

with which it is most nearly connected, to make and use the same." 35 U.S.C. §

112(a) (codifying the "enablement requirement" for a patent's specification). Thus,

the 539 Patent discloses sufficient information to allow a surgeon to perform the

procedure and a medical instrument manufacturer to make the instruments.[7] The

USPTO published Orthocision's application for the 539 Patent on September 10,

2015 (Ex. 37 at 2), so the PsiF surgical method and tools for accomplishing it were

---

[7] In addition to the USPTO, Omnia agrees that the 539 Patent satisfies this standard. (Ex. 38 at
121:4–122:4; 122:7–123:14).

public information almost two years before the Stocking Agreement was signed. Therefore, they are not confidential information as a matter of law. *Rainworks Ltd. v. Mill-Rose Co.*, 622 F. Supp. 2d 650, 658 (N.D. Ohio 2009) (holding former licensee of patent did not breach confidentiality agreement by using information disclosed in the formerly-licensed patent because that information "is in the public domain" and therefore not confidential); *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998) ("As we have often explained, . . . the patent system represents a carefully crafted bargain that encourages both the creation *and the public disclosure* of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.") (emphasis added).

• Before the Stocking Agreement was signed, Omnia provided to PainTEQ a copy of the PsiF Surgical Technique Guide, color photographs of the instruments, CAD images of the instruments, post-operative imaging of the implant, and an image and detailed description (including dimensions) of the implant. (Ex. 40).

• Before the Stocking Agreement was signed, Omnia and PainTEQ trained physicians on the PsiF procedure and Omnia provided the physical instruments to PainTEQ to evaluate. (Ex. 41 at 36:8–15; 37:11–21); (Ex. 45); (Ex. 46).

• In the years prior to execution of the Stocking Agreement, the PsiF procedure had been marketed to and performed by countless medical professionals, and its implant had been implanted in many patients, none of whom signed confidentiality or nondisclosure agreements or had any other obligation of confidentiality. (Ex. 38 at 76:17–77:15); (Ex. 39 at 45:17–23, 64:9–65:25).

The undisputed record evidence shows that before the Stocking Agreement was signed, virtually every detail about the PsiF procedure was disclosed to the public, generally, or to PainTEQ specifically, which is exactly what one would expect for a patented medical procedure that was being actively marketed and performed. For those same reasons, information regarding the PsiF surgical procedure or the instruments for performing it were not, and are not, "confidential information" as that term is defined in the Stocking Agreement. (Ex. 34); *Rainworks,* 622 F. Supp. 2d at 658 (granting summary judgment for defendants and stating "[i]t is Plaintiffs' burden to establish the confidential nature of the information, and to demonstrate that [defendant] disclosed or used information which was not in its possession or in the public domain."); *see also Northern Chemical Blending Corp., Inc. v. Strib Industries, Inc.*, 2018 WL 4043487 at *11 (Ohio App. 8 Dist.) (affirming summary judgment in favor of defendants where plaintiff failed to establish defendant inappropriately used or disclosed any confidential information in violation of an NDA*).*

Second, Omnia has not identified any damages caused by this alleged breach. During fact discovery Omnia indicated in its interrogatory answers and Rule 26 initial disclosures that it could not calculate damages attributable to this (or any other) claim. (Ex. 32, Rog. 17); (Ex. 42); (Ex. 38 at 285:13-16). Neither has been amended. During its 30(b)(6) deposition, right before fact discovery closed, Omnia declined to testify at all about the damages it is seeking for this (or any other) claim, instead deferring to its expert on all things relating to damages. (Ex.

38 at 250:5-13, 285:13-16). Critically, however, Omnia's expert did not offer any opinions of or relating to Omnia's claim for breach of the Stocking Agreement's confidentiality provision. PainTEQ is therefore entitled to summary judgment for the independent reason that there is no record evidence of either causation or damages flowing from this alleged breach. *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010); *see also Vital Pharm., Inc. v. Monster Energy Co.*, 2022 WL 3083273, at *2 (11th Cir. Aug. 3, 2022)(affirming order striking trademark claim where plaintiff failed to identify its damages during discovery or through its expert); *Cardiovascular Support Perfusion Reliance Network, LLC v. SpecialtyCare, Inc.*, 629 F. App'x 673, 677 (6th Cir. 2015) (upholding summary judgment for defendant where plaintiff failed to present reasonable evidence to allow a jury to conclude breach of an NDA by defendant caused any resultant damage to plaintiff).

Finally, during discovery hearings and in related filings, Omnia has argued that certain of the discovery it has sought is appropriate to support a claim for breach of the non-circumvention claim found in section 14 of the Stocking Agreement. *See, e.g.*, (Ex. 47 at 3). PainTEQ has consistently objected to those efforts because Omnia has never pled a claim for breach of the non-circumvention provision and, despite alluding to such a claim for at least a year, it has never sought leave to do so. (Ex. 14 at 45, ¶ 111). To the extent Omnia is actually attempting to bring this claim, PainTEQ requests summary judgment in its favor.

## VIII. CONCLUSION

For the reasons stated above, PainTEQ is entitled to summary judgment in

its favor on Counts II-X of Omnia Medical, LLC's Counterclaim (Doc. 20) and

Count VI of its Complaint (Doc. 1) filed in Case No. 8:22-cv-00145.

*/s/ David L. Luikart III*
David L. Luikart III (FBN 21079)
Stephen E. Kelly (FBN 29091)
Ryan J. Leuthauser (FBN 99517)
Thomas J. Banks (FBN 1017731)
HILL WARD HENDERSON, P.A.
101 East Kennedy Blvd., Ste. 3700
Tampa, Florida 33602
Tel: (813) 221-3900
Fax: (813) 221-2900
Dave.Luikart@hwhlaw.com
Stephen.Kelly@hwhlaw.com
Ryan.Leuthauser@hwhlaw.com
Thomas.Banks@hwhlaw.com
Ann-Marie.Hallett@hwhlaw.com
Michelle.Armstrong@hwhlaw.com
Chelsea.Bonetti@hwhlaw.com
Julie.Mcdaniel@hwhlaw.com
*Attorneys for PainTEQ, LLC*